[No. 42188.  En Banc.  October 5, 1972.]

ELIZABETH A. FLEMING, *Respondent*, v. THE CITY OF TACOMA *et al.*, *Appellants.*

*Burton W. Lyon, Jr., Robert R. Hamilton,* and *F. H. Chapin,* for appellants.

*Quinby R. Bingham,* for respondent.

STAFFORD, J.—This case involves an alleged conflict of interest on the part of a city councilman who voted in favor of a zoning amendment.

In March 1969, the application of certain land developers, for a zoning reclassification of four parcels of real property in the vicinity of the Narrows Bridge in the city of Tacoma, was placed on the agenda of the Tacoma Planning Commission. The City of Tacoma and the land developers are appellants herein. The proposal sought to change the area from R-1 and R-2, single family residence districts, to an R-3 and R-5 PRD, multiple family planned residential development district. The primary purpose was to authorize construction of a high-rise condominium although the requested reclassification would also have permitted construction of town houses and retirement homes as well. The planning commission recommended approval, subject to certain conditions.

On July 1, 1969, the Tacoma City Council held a public hearing on the proposed rezoning. At its conclusion, the council concurred with the planning commission's recommendation and, by a 5-4 vote, directed the city attorney to prepare an ordinance to rezone the area. Councilman Murtland voted with the majority.

At the first reading of the ordinance on August 19, 1969, another public hearing was held. Respondent and neighbors living adjacent to the property to be rezoned presented testimony in opposition to the application. They claimed the proposed high-rise condominium would obstruct their view of Puget Sound and would be detrimental to the value of their property because covenants running with the land restricted use to single family dwellings whereas the property under consideration for rezoning was not similarly

restricted. The neighbors also alleged that the proposal constituted spot zoning.

On August 26, 1969, the ordinance came on for the second and final reading. Respondent and the other neighboring property owners again protested the probable loss of property value. Councilman Murtland suggested further study of the effect of the ordinance upon the abutting property which was burdened with restrictive covenants. The council refused and a vote was called. The ordinance lost by a tie vote of 4-4, Councilman Murtland voting against it. Having voted with the prevailing side, Councilman Murtland was empowered to move for reconsideration of the ordinance.

At the next council meeting, Councilman Murtland moved to reconsider. The motion passed 6-3, Councilman Murtland voting with the majority. As a result, consideration of the ordinance was placed on the council's September 17 agenda. On September 17 the ordinance passed by a vote of 6-3. This time Councilman Murtland voted in favor thereof. The meeting was adjourned about 10 p.m., September 17, 1969.

On September 19, less than 48 hours after the final vote, Councilman Murtland, now acting as attorney for the successful land developers, wrote to the Secretary of State asking whether the name Bridgeview Development Company was available for his clients' corporate use. On September 26, 1969, articles of incorporation for the Bridgeview Development Company were executed by the land developers in the law office of Councilman Murtland. They were approved by the Secretary of State on October 1, 1969. The ordinance became law on October 2, 1969. Mr. Murtland remained a city councilman until well after the events here involved.

Thereafter, respondent applied for a writ of certiorari alleging, *inter alia,* that the rezone was illegal because (a) the council failed to consider the ordinance's effect on abutting property which was burdened with restrictive covenants, and (b) the rezone constituted spot zoning. Follow-

ing a hearing the trial court orally denied the writ. Thereafter respondent moved for reconsideration of the court's oral decision, alleging new evidence of a possible conflict of interest on the part of Councilman Murtland.

After a hearing on the conflict of interest issue, the trial court entered judgment against respondent on those matters contained in the original writ application but held the ordinance was invalid because it would appear to third persons "that a conflict of interest and impropriety existed in the action of the council . . . during passage of [the] Ordinance." Although the court specifically found that no actual conflict of interest existed, it also found that:

> by reason of the representation of the applicant [developer] by Councilman Murtland two days following the final vote on [the] ordinance . . . that the public has not been afforded the action and decision of a public official that is free of suspicion of unfairness or temptation to which they are entitled in the passage of zoning reclassification ordinances.

■ We have long passed the time when one may use his land as he wishes provided it creates no nuisance. The concentration of population and the infinite variety of modern land uses necessitate effective land use planning. The restrictions on use, inherent in zoning, insure that if one uses his property in a way harmonious with the existing zoning codes, he will be free from the danger that the future use of his neighbor's land might be detrimental to or foreclose his own established use. Decisions which amend or change conditions under existing zoning laws therefore require an extremely sensitive balance between individual rights and the public welfare. The process by which such decisions are made must not only be fair but must appear to be fair to insure public confidence therein.

In recent years we have adopted the appearance of fairness doctrine in zoning decisions. Three cases in particular have developed the essential guidelines.

In *Smith v. Skagit County*, 75 Wn.2d 715, 739, 453 P.2d 832 (1969), we said:

whenever the law requires a hearing of any sort as a condition precedent to the power to proceed, it means a fair hearing, a hearing not only fair in substance, but fair in appearance as well. . . . Where the law expressly gives the public a right to be heard . . . the public hearing must, to be valid, meet the test of fundamental fairness, for the right to be heard imports a reasonable expectation of being heeded. Just as a hearing fair in appearance but unfair in substance is no fair hearing, so neither is a hearing fair in substance but appearing to be unfair.

In *Smith* we focused our attention upon defects in the hearing itself rather than upon motives of the members who conducted the hearing. We held that hearings before the county planning commission and board of county commissioners failed to meet the test of fairness.[1] We were particularly disturbed by the planning commission's closed executive session to which proponents were invited and opponents excluded, and by the county commissioners' refusal to allow opponents to present their views on certain occasions. Additionally, there was a sharp contrast between the deliberative consideration given the original zoning and the hasty consideration given its amendment.

In two subsequent cases we shifted our attention from hearing procedures to the motives of those who conducted them. In *Chrobuck v. Snohomish County*, 78 Wn.2d 858, 480 P.2d 489 (1971), we held that hearings before the county planning commission lacked an appearance of fairness because a member thereof had close prior social and business

---

[1] *Smith v. Skagit County*, 75 Wn.2d 715, 741, 453 P.2d 832 (1969):

The test of fairness . . . in public hearings conducted by law on matters of public interest . . . is whether a fair-minded person in attendance at all of the meetings on a given issue, could, at the conclusion thereof, in good conscience say that everyone had been heard who, in all fairness, should have been heard and that the legislative body required by law to hold the hearings gave reasonable faith and credit to all matters presented, according to the weight and force they were in reason entitled to receive.

For a commentary on the appearance of fairness doctrine articulated in *Smith*, see Comment, *Public Hearings—An Appearance of Fairness*, 5 Gonzaga L. Rev. 324 (1970).

connections with a proponent of the rezone and his successor had publicly supported the proponent's position prior to his appointment. We were critical of the fact that even though the challenged commissioner had not voted, he had participated in the commission's deliberations. Similarly, in *Buell v. Bremerton*, 80 Wn.2d 518, 496 P.2d 1358 (1972), we held that hearings before a city planning commission lacked an appearance of fairness because one of its members owned property that appreciated in value as a result of the decision. In *Buell* there was a question as to whether the commission member had actually voted. We held, however, that even if he had not voted there was a possible conflict of interest because the value of his own property had been appreciated by the rezone. We therefore invalidated the planning commission's actions, stating at page 525:

> The fact that the action carried without the necessity of counting his vote is not determinative. The self-interest of one member of the planning commission infects the action of the other members of the commission regardless of their disinterestedness.

The challenged actions in both *Chrobuck* and *Buell* were taken by administrative bodies.

In the past we have examined the motives of administrative officers when reviewing their decisions in zoning matters.[2] On the other hand, we have refrained from such an examination of legislative bodies, *i.e.*, boards of county commissioners or city councils, when acting pursuant to statutes regulating zoning. We have held that while so acting they are exercising legislative powers and therefore we will not, in the absence of fraud, inquire into the motives of their members. *Lillions v. Gibbs*, 47 Wn.2d 629, 632, 289 P.2d 203 (1955). The question here is whether we should continue in that vein or whether we should extend the appearance of fairness doctrine to encompass an examination into the motives of city councilmen and county com-

---

[2]Our practice conforms with that in other jurisdictions. *See* Annot., 10 A.L.R.3d 694 (1966).

missioners when acting in a legislative capacity upon zoning amendments.

■ Generally courts will not inquire into the motives of legislative officers acting in a legislative capacity. *Goebel v. Elliott,* 178 Wash. 444, 35 P.2d 44 (1934); *Cornelius v. Seattle,* 123 Wash. 550, 213 P. 17 (1923); 1 C. Antieau, *Municipal Corporation Law* § 5:15 (1968); 5 E. McQuillin, *The Law of Municipal Corporations* § 16.90 (3d ed. 1969 rev. vol.); Annot., 32 A.L.R. 1517 (1924). The rule follows from the doctrine of the separation of powers. *Angle v. Chicago, St. P., M. & O. Ry.,* 151 U.S. 1, 18-19, 38 L. Ed. 55, 14 S. Ct. 240 (1894). The rule's wisdom is stated in *Schauer v. Miami Beach,* 112 So. 2d 838, 841 (Fla. 1959):

> Aside from the reasons for the general rule given in the cited cases, that is, the preservation of the independence of the three branches of government, it is not difficult to picture the havoc that would be wrought in legislative bodies if each member of them could by decree of the judiciary be declared disqualified to participate in any legislation that affected a class, race, creed, business, profession, occupation, association or trade to which he belonged.

Although a majority of courts follow the rule in the zoning context,[3] we are convinced that zoning amendments or zoning reclassifications are sufficiently distinguishable from other legislative functions that an exception to the general rule is desirable.[4]

Zoning decisions may be either administrative or legislative depending upon the nature of the act. *See Durocher v. King County,* 80 Wn.2d 139, 492 P.2d 547 (1972). But, whatever their nature or the importance of their categorization for other purposes, zoning decisions which deal with an amendment of the code or reclassification of land there-

[3] *See* Annot., 71 A.L.R.2d 568 (1960).

[4] *See* Note, 57 Mich. L. Rev. 423 (1959). Other jurisdictions have reached a similar result by classifying the actions of a city council in passing a rezoning amendment or granting a planned residential development permit as an administrative action. *See, e.g., RK Dev. Corp. v. Norwalk,* 156 Conn. 369, 242 A.2d 781 (1968); *Aldom v. Roseland,* 42 N.J. Super. 495, 127 A.2d 190 (1956).

under must be arrived at fairly. The process by which they are made, subsequent to the adoption of a comprehensive plan and a zoning code, is basically adjudicatory.

Generally, when a municipal legislative body enacts a comprehensive plan and zoning code it acts in a policy making capacity. But in amending a zoning code, or reclassifying land thereunder, the same body, in effect, makes an adjudication between the rights sought by the proponents and those claimed by the opponents of the zoning change. The parties whose interests are affected are readily identifiable. Although important questions of public policy may permeate a zoning amendment, the decision has a far greater impact on one group of citizens than on the public generally.

Another feature of zoning amendment decisions, which distinguishes them from other types of legislative action, is their localized applicability. Other municipal ordinances which affect particular groups or individuals more than the public at large apply throughout an entire geographic area within the municipal jurisdiction, whereas ordinances that amend zoning codes or reclassify land thereunder apply only to the immediate area being rezoned.

Finally, legislative hearings are generally discretionary with the body conducting them, whereas zoning hearings are required by statute, charter, or ordinance. The fact that these hearings are required is itself recognition of the fact that the decision making process must be more sensitive to the rights of the individual citizen involved.

In light of these distinctions, it is appropriate to apply the appearance of fairness doctrine to all hearings, conducted by a municipal legislative body, which are aimed at amending existing zoning codes or reclassifying land thereunder. Not only must the hearings appear fair, but the motives of the persons conducting the hearings and voting therein must be above reproach. We expressly overrule that portion of *Lillions v. Gibbs, supra,* which states the contrary rule. We now hold that members of municipal legislative bodies who conduct such hearings must, as far as

practicable, be open-minded and free of entangling influences. As we said in *Buell v. Bremerton, supra* at 523, they must be "capable of hearing the weak voices as well as the strong. . . . It is important not only that justice be done but that it also appear to be done . . ."

In this case there is direct, tangible evidence that a city councilman was employed by the successful proponents of a zoning amendment, for which the councilman voted in the majority. While the evidence goes only so far as to show the councilman's employment, less than 48 hours after the critical vote on the rezoning application, the inference that such employment was arranged before the vote cannot be ignored. As the trial judge stated in his oral opinion:

> I will go out of my way here to say that I believe Mr. Murtland when he said there was no contact regarding employment before the 19th of September. I believe it because I have known him for twenty-five years, and my experience observing him is that this is not the type of thing that he would tell us anything other than the truth on. The problem is that's what I believe. That is not what the Relators believe, I am sure of that. That is not what the Relators believe, and that is not what the average person looking at the process of what has transpired would be inclined to believe.
>
> The time coincidence is devastating. It is unfortunate this probably has taken place because this was one of those days that we all have where a problem arose and a man just didn't think about the whole implications of what he was doing. The appearance of conflict of interest is here. The appearance of conflict of interest is so strong that I am sure those who oppose the zoning and who thought this thing through will never, never believe that somehow this wasn't kind of wired before the final vote was taken.

We agree with the trial court. The proceedings in which the questioned zoning amendment was enacted is permeated with an appearance of unfairness by Councilman Murtland's conduct. We therefore hold that the ordinance is invalid, notwithstanding that Councilman Murtland's vote was unnecessary for passage.

Our disposition makes it unnecessary to reach the issues raised in respondent's cross-appeal.

The trial court is affirmed.

HAMILTON, C.J., FINLEY, ROSELLINI, HUNTER, HALE, WRIGHT, and UTTER, JJ., concur.

NEILL, J. (concurring)—The record is clear that councilman Murtland was not employed by the developers seeking the zone change until 2 days after final action on the ordinance. The trial court expressly found there was no conflict of interest, but felt compelled to invalidate the ordinance by reason of the "appearance of fairness" doctrine enunciated by this court in *Smith v. Skagit County*, 75 Wn.2d 715, 453 P.2d 832 (1969), and thereafter broadened in *Chrobuck v. Snohomish County*, 78 Wn.2d 858, 480 P.2d 489 (1971), and *Buell v. Bremerton*, 80 Wn.2d 518, 495 P.2d 1358 (1972).

I have previously expressed my dissent from this doctrine particularly as applied to legislative bodies. *See* dissents in *Chrobuck* and *Buell*. My reasons for such disagreement with the majority of the court have been primarily based on the principle of separation of powers. Legislation is not to be nullified by the judicial branch of government unless the enactment contravenes the constitution or is manifestly unreasonable, arbitrary and capricious. *E.g., see Farrell v. Seattle*, 75 Wn.2d 540, 452 P.2d 965 (1969). In enacting a comprehensive plan and adopting zoning controls, a legislative body is clearly acting in a legislative capacity. Further, certain amendments to zoning ordinances are legislative in nature. *E.g.*, amendments to the comprehensive plan itself and amendments as to the type of activity permitted in a particular classification throughout the community.

In today's decision this court adopts the view that reclassification of specific tracts (rezone) is adjudicatory in nature, rather than legislative. I perceive good reason to modify my previous view as expressed in the dissents in *Chrobuck* and *Buell*, to the extent of recognizing that the final

decision on a rezone amendment partakes of an adjudication of the private property rights between or among two or more landowners and is properly viewed as being a quasi-judicial action.[5]

I remain unconvinced that this "appearance of fairness" doctrine is sufficiently definite and reckonable for practical application, but having failed to obtain a majority on this issue in either *Chrobuck* or *Buell,* I must recognize that the doctrine has been adopted as the law of the state. Accordingly, I concur in the result of the majority opinion.

---

[5]*Chrobuck v. Snohomish County,* 78 Wn.2d 858, 480 P.2d 489 (1971), and *Buell v. Bremerton,* 80 Wn.2d 518, 495 P.2d 1358 (1972), are distinguishable from the instant case in that both involved suspect activity by members of a planning commission—an administrative body possessing only recommendatory powers. In the case at bench, bias is charged to a member of a city council, the body ultimately responsible for the fate of the proposed rezone amendment.