[No. 4156-1. Division One. August 30, 1976.]

THE CITY OF SEATTLE, *Respondent*, v. LOUTSIS INVESTMENT Co., INC., *Petitioner*.

*Bogle & Gates, Jay H. Zulauf,* and *Ernest E. Merges,* for petitioner.

*John P. Harris, Corporation Counsel,* and *G. Grant Wilcox* and *James B. Howe, Jr., Assistants,* for respondent.

ANDERSEN, J.—

## FACTS OF CASE

This action challenges the validity of Seattle's Pike Place Urban Renewal Project and the condemnation of the Cliff House Hotel which is a part of that project.

Some knowledge of the history of the area affected is necessary to an understanding of the issues presented.

It was in 1907 that farmers were first allowed to park wagons along a planked Seattle street overlooking Elliott Bay and Puget Sound. There they sold the fruits, vegetables, and other produce of their farms directly to the people of the Seattle area. From that day to this, the Pike Place Market has been one of the City's distinctive features. This colorful area is now listed in the National Register of Historic Places and is known at least nationwide.

The market still flourishes. Today, in addition to farmers' stalls, as of old, it accommodates a picturesque profusion of fish and meat markets, food stores, antique and collectors' shops, flower vendors, restaurants, taverns, craft stalls, and other shops of many kinds.

During almost 7 decades of growth and change, however,

many of the structures in the market district have deterio-
rated. The deterioration has reached a degree which has
threatened not only the structures themselves but the en-
tire market district as well. Violations of health, fire, mini-
mum housing, and building codes abound.

Over the years, fires have also damaged or destroyed
many of the buildings. The result is that some sites in the
area are vacant while others are used as parking lots. Sev-
eral existing structures represent the remaining ground
floor and basement levels of fire-damaged buildings. Others
are of wood frame construction now prohibited in the fire
zone in which they are located.

It was 1965 when the City of Seattle identified a 22-acre
area, including the market, as suitable for redevelopment
under the federally assisted urban renewal program. This
site is located between Seattle's downtown retail store dis-
trict on the east and the Elliott Bay waterfront on the west.
In 1969, the Seattle City Council adopted an urban renewal
plan for the area.[1]

The 1969 urban renewal plan, with the exception of the
central market core, was based on the demolish-and-redev-
elop approach to urban renewal.

Federal funding of the 1969 urban renewal plan was
approved in 1971. Also in that year, however, market pres-
ervation advocates took the preservation issue directly to
the people by an initiative campaign. The initiative was
approved by a vote of the citizens of Seattle in November
of 1971 and resulted in the passage of the Pike Place Mar-
ket Historical District Ordinance.[2] This ordinance created a
7-acre Pike Place Market Historical District and a Market
Historical Commission to "preserve, improve and restore
the Pike Place Market."[3] Under the ordinance, a certificate

---

[1] City of Seattle ordinance No. 98016.

[2] City of Seattle ordinance No. 100475.

[3] "In order to promote the educational, cultural, farming, marketing,
other economic resources, and the general welfare; and to assure the
harmonious, orderly, and efficient growth and development of the
municipality, it is deemed essential by the people of the City of Seattle
that the cultural, economic, and historical qualities relating to the Pike

of approval from the Market Historical Commission is required before any change can be made in any building or structure within the historical district.

Creation of the 7-acre historical district within the existing 22-acre urban renewal district required changes to be made in the original plan. An amended plan was later adopted by the Seattle City Council. This is the present Pike Place Urban Renewal Plan (Pike Place Plan) which was signed into law by the mayor in 1974.[4] The result is that the present Pike Place Plan now operates in both urban renewal and historical preservation contexts.

Several old hotels are within the historical district. They initially served merchant mariners on shore leave and farmers in town to sell their goods and produce at the market. As the demand for hotel rooms among these transient customers declined, the hotels increasingly began accommodating persons with low incomes in need of low-rent housekeeping rooms and apartments, or else went out of business. Along with the district that they are a part of, the hotels deteriorated in varying degrees.

One of the hotels which eventually became inoperative is the 6-story Cliff House Hotel (Cliff House) owned by Loutsis Investment Co., Inc. (Loutsis). The Cliff House had rotted floor beams, cracked and spalled concrete walls, water damaged plaster partitions, had suffered the loss of a part of its ceilings, and was in violation of numerous provisions of the city code including the fire code.

The Pike Place Plan lists the Cliff House as one of the structures within the historical district which is fundamentally unchanged from its original condition and designates

Place Markets and the surrounding area, and an harmonious outward appearance and market uses which preserve property values and attracts [sic] residents and tourists be preserved and encouraged; some of the qualities being: The continued existence and preservation of historical areas and buildings; continued constructions and use of buildings for market activities, especially on street levels; and a general harmony as to style, form, color, proportion, texture, material, occupancy and use between existing buildings and new construction." City of Seattle ordinance No. 100475, § 1.

[4]City of Seattle ordinance No. 102916.

it as one of the buildings to be rehabilitated. Urban renewal officials and representatives of Loutsis entered into negotiations relative to Loutsis itself rehabilitating the hotel. The extent and nature of the negotiations are disputed. In any event, they were discontinued, and in July of 1975, the City enacted an ordinance providing for the acquisition of the Cliff House by condemnation.[5]

The City thereupon filed this condemnation action. Following a contested hearing at which testimony and evidence were presented, the trial court entered its findings of fact and conclusions of law in favor of the City and an adjudication of public use and necessity followed. On Loutsis' petition to this court, we granted certiorari to review the proceedings in the trial court. CAROA 57(b)(4).[6]

The City filed a motion to quash the writ of certiorari on procedural grounds. We deny the City's motion and address the appeal on its merits.

Loutsis' 19 assignments of error present 5 issues which are dispositive of this case.

## ISSUES

ISSUE ONE. Are the statutes and ordinances under which Seattle's Pike Place Urban Renewal Project was established, or the proceedings by which the Cliff House is being condemned, unconstitutional or otherwise illegal?

ISSUE TWO. Did the trial court err in finding and concluding that there was a public use and necessity for the condemnation of the Cliff House?

ISSUE THREE. Under the urban renewal statutes and ordinances does the property owner have a right of first refusal with respect to the rehabilitation or redevelopment of the owner's property?

ISSUE FOUR. Did improper conduct by city employees invalidate the condemnation of the Cliff House?

---

[5]City of Seattle ordinance No. 104709.

[6]RAP 2.2(a)(4) adopted effective July 1, 1976, makes orders of public use and necessity appealable as a matter of right and eliminates the necessity of a party seeking permission to obtain review. *See* Comment, RAP 2.2, 86 Wn.2d 1144 (1976).

ISSUE FIVE. Was sufficient evidence presented to the trial court to sustain its findings of fact?

DECISION

ISSUE ONE.

CONCLUSION. This State's Urban Renewal Law and the City ordinances establishing the Pike Place Urban Renewal Project are constitutional and the condemnation of the Cliff House did not violate the equal protection of the laws clause of our federal constitution or the privileges and immunities clause of our state constitution.

Urban renewal or redevelopment is generally defined as a plan for the renewal or redevelopment, for all types of uses, of areas suffering from blight or decay, through a program of cooperation between government and private enterprise. The former contributes its power of eminent domain to assemble the needed parcels of land and the latter ordinarily does the actual redevelopment work. 40 Am. Jur. 2d *Housing Laws and Urban Redevelopment* § 2, at 1061 (1968); Annot., 45 A.L.R.3d 1096, 1100 (1972).

There has also been an increasing recognition by the courts of the public interest in the preservation of historical buildings, places, and districts. *Opinion of the Justices to the Senate,* 333 Mass. 773, 128 N.E.2d 557, 562 (1955); 40 Am. Jur. 2d *Housing Laws and Urban Redevelopment* § 6, at 31 (Supp. 1976); 1A C. Antieau, *Municipal Corporation Law* § 8B.16 (1974). Judicial approval has been extended to the creation of such historic districts as the Vieux Carre section of New Orleans and the old island whaling village of Nantucket. *New Orleans v. Levy,* 223 La. 14, 64 So. 2d 798 (1953); *Opinion of the Justices to the Senate, supra. See also Berman v. Parker,* 348 U.S. 26, 35, 99 L. Ed. 27, 75 S. Ct. 98 (1954). In the Vieux Carre and Nantucket cases, as in the present case, aesthetic considerations were not the sole reason for the legislation in question, however.

Several of Loutsis' assignments of error and its most vigorous arguments, while phrased differently, deal with the same basic issue. The primary thrust of these assignments is that it is improper, on various legal and constitu-

tional principles, for the City to condemn Loutsis' property for the avowed purpose of leasing or selling it to somebody else to rehabilitate or redevelop.

Whatever logic Loutsis' argument may appear on its face to have, the law in this regard is now well settled to the contrary.

This State's Urban Renewal Law empowers cities to determine the existence of blighted areas within their environs, to acquire land and structures in such areas by purchase or condemnation and, after acquisition, to hold, improve, clear, or prepare the property for rehabilitation or redevelopment. RCW 35.81.070-.090; *Miller v. Tacoma*, 61 Wn.2d 374, 379, 378 P.2d 464 (1963). As the facts of this case amply establish, and as the City ordinance proclaimed and the trial court found, the Cliff House is undoubtedly within a "blighted area" as that term is defined by the Urban Renewal Law. RCW 35.81.010(2).

Cities are also empowered to sell, lease, or otherwise transfer property in such blighted areas to private enterprise for use in accordance with their urban renewal plans. RCW 35.81.090; 40 Am. Jur. 2d *Housing Laws and Urban Redevelopment* § 22, at 1077 (1968).

One of the available means by which the objective of urban renewal is intended to be achieved in such situations is that the cities may impose on the lessees or purchasers of the acquired property and on their successors the obligation to devote the property only to the uses specified in the urban renewal plan and to comply with such other requirements as the cities determine to be in the public interest. RCW 35.81.090(1); 1A C. Antieau, *Municipal Corporation Law* § 8B.17 (1974).

The view that urban renewal plans such as the Pike Place Plan constitute valid public uses for which the power of eminent domain may be exercised and for which public funds may lawfully be expended is approved by the overwhelming weight of authority in this country, including the Supreme Court of our own state. *Miller v. Tacoma, supra* at 388; Annot., 44 A.L.R.2d 1414 (1955). As expressed

by the United States Supreme Court in a similar case:

> The rights of [the] property owners are satisfied when they receive that just compensation which the Fifth Amendment exacts as the price of the taking.

*Berman v. Parker, supra* at 36.

Loutsis also argues that "[t]he City has no reasonable basis for classifying the Loutsis property in a manner different from the classification of contiguous property" and claims that because of this the condemnation violates the equal protection clause of the federal constitution and the privileges and immunities clause of our state constitution. U.S. Const. amend. 14; Const. art. 1, § 12. Loutsis has the burden of proving any such violations. *State v. Kent*, 87 Wn.2d 103, 109, 549 P.2d 721 (1976). Its argument is predicated on the fact that the Pike Place Plan classifies the Cliff House as property "to be acquired," whereas the plan classifies adjoining and nearby hotels as properties "subject to acquisition" and which therefore may or may not be acquired.

Equal protection does not require identity of treatment. *Walters v. St. Louis*, 347 U.S. 231, 237, 98 L. Ed. 660, 74 S. Ct. 505 (1954). Neither does it require things which are different in fact be treated in law as though they are the same. *Rinaldi v. Yeager*, 384 U.S. 305, 309, 16 L. Ed. 2d 577, 86 S. Ct. 1497 (1966).

The Cliff House is not the same as the other nearby hotels nor, obviously, does it stand in the identical location that they do. In any condemnation, boundaries must be drawn some place and decisions made as to which parcels will be taken and which ones rejected. As the United States Supreme Court has held:

> It is not for the courts to oversee the choice of the boundary line nor to sit in review on the size of a particular project area.

*Berman v. Parker, supra* at 35.

There has been no showing that the City's classification was not a rational one nor that it was outside the bounds of the City's discretion. There was therefore no violation of

the equal protection of the laws clause of the federal constitution nor of the privileges and immunities clause of our state constitution. *State v. Persinger*, 62 Wn.2d 362, 368, 382 P.2d 497 (1963); 1A C. Antieau, *Municipal Corporation Law* § 8B.14 (1974-75). *See* Barrett, *Judicial Supervision of Legislative Classifications—A More Modest Role for Equal Protection*, 1 Brigham Young U.L. Rev. 89 (1976).

Issue Two.

Conclusion. The adjudication of public use and necessity was a proper one. The Pike Place Project is a public use and the taking of the Cliff House was, in contemplation of the law, a necessary taking.

■ A condemnation action has three phases: first, the adjudication of public use and necessity; second, a determination of the damages to be awarded to the owner, and third, payment of the amount of the award and entry into possession. *State ex rel. Lange v. Superior Court*, 61 Wn.2d 153, 156, 377 P.2d 425 (1963); *King County v. Farr*, 7 Wn. App. 600, 602, 501 P.2d 612 (1972). This case involves the first phase of the condemnation only, the adjudication of public use and necessity.

■ The issues of whether or not a proposed acquisition is really for a *public use* is solely a judicial question, although a legislative declaration thereof will be accorded great weight. *Miller v. Tacoma, supra* at 383; *Tacoma v. Welcker*, 65 Wn.2d 677, 684, 399 P.2d 330 (1965). Loutsis does not argue that the trial court's finding that the property is being taken for a public use was improper.

■ On the other hand, the issue of whether the contemplated acquisition is *necessary* to carry out the proposed public use presents a legislative question, and a declaration of necessity by the appropriate legislative body will be deemed conclusive by the courts in the absence of actual fraud or such arbitrary and capricious conduct as would amount to constructive fraud. *In re Port of Seattle*, 72 Wn.2d 932, 936, 435 P.2d 991 (1967); *State v. Bank of California*, 5 Wn. App. 861, 865, 491 P.2d 697 (1971). The burden of proving fraud or constructive fraud is on the

objector. *In re Port of Seattle*, 80 Wn.2d 392, 398, 495 P.2d 327 (1972); *Medical Lake v. Brown*, 63 Wn.2d 41, 45, 385 P.2d 387 (1963).

Loutsis' position is that since it was willing to develop the hotel property itself (though not for the purpose of providing low income housing as the City contemplates) there was not such a legal "necessity" as would justify the condemnation. Here the city council by ordinance declared a necessity to take the Cliff House for urban renewal purposes. This determination of necessity was for the City to make. RCW 35.81.080.

■ Proof that the condemnation of some other property would have served the City's purpose just as well or better than condemnation of the Cliff House will not defeat the City's selection of Loutsis' property. *State ex rel. Hunter v. Superior Court*, 34 Wn.2d 214, 219, 208 P.2d 866 (1949); *State ex rel. St. Paul & Tacoma Lumber Co. v. Dawson*, 25 Wn.2d 499, 507, 171 P.2d 189 (1946).

The City was only required to show a reasonable necessity for the taking. *Tacoma v. Welcker, supra* at 683; *King County v. Farr, supra* at 604. It did so, as the trial court found based on evidence presented.

Loutsis failed to prove bad faith or arbitrary, capricious, or fraudulent action by the City in selecting the Cliff House for condemnation, therefore the selection will be deemed conclusive. *Asotin County Port Dist. v. Clarkston Community Corp.*, 73 Wn.2d 72, 75, 436 P.2d 470 (1968); *State v. Burdulis*, 70 Wn.2d 24, 25, 421 P.2d 1019 (1966). *See also* 1A C. Antieau, *Municipal Corporation Law* § 8B.15 (1974).

Issue Three.

Conclusion. Our state's urban renewal statutes and the ordinances and urban renewal plan here under consideration do not mandate owner participation in the urban renewal nor do they extend the displaced owner a veto right or right of first refusal in the redevelopment of the property.

The urban renewal enabling statutes of this state, like those of most states, appear to have been designed primar-

ily for the purpose of qualifying local renewal projects for federal aid under 42 U.S.C. §§ 1441-60 which authorizes the grant of federal matching funds for qualified local renewal projects. *See* RCW 35.81.070(5).

The federal statute provides:

> [P]rivate enterprise shall be encouraged to serve as large a part of the total need as it can.

42 U.S.C. § 1441. The state counterparts of the federal statutes in turn require municipalities to use private enterprise in carrying out urban renewal to the greatest extent that such municipalities determine to be feasible.[7] A City ordinance and the Pike Place Plan contain comparable admonitions.[8]

Based on such private enterprise preference language in the statutes, ordinance, and Pike Place Plan, Loutsis argues that "[w]hen a property owner has demonstrated a willingness to redevelop his property on his own, and it is not shown that he is unable to do so, the City must provide the individual with the opportunity to rehabilitate his property in order to comply with the Urban Renewal Act."

It is true that a few states do by statute require that a preference in redevelopment be given to businesses and persons displaced by urban renewal. *See* Brownfield, *The Disposition Problem in Urban Renewal*, 25 Law & Contemp.

---

[7]RCW 35.81.030 provides:

"A municipality, to the greatest extent it determines to be feasible in carrying out the provisions of this chapter, shall afford maximum opportunity, consistent with the sound needs of the municipality as a whole, to the rehabilitation or redevelopment of the urban renewal area by private enterprise. A municipality shall give consideration to this objective in exercising its powers under this chapter, including the formulation of a workable program, the approval of urban renewal plans (consistent with the comprehensive plan or parts thereof for the municipality), the exercise of its zoning powers, the enforcement of other laws, codes and regulations relating to the use of land and the use and occupancy of buildings and improvements, the disposition of any property acquired, and the provision of necessary public improvements." *See also* RCW 35.81.020 and RCW 35.81.060(4).

[8]City of Seattle ordinance No. 102916, § 4; Pike Place Urban Renewal Plan (printed edition—undated) §§ IV A(2) and (3). Exhibit 6 herein.

Prob. 732, 748 (1960). Even under statutes flatly mandating owner participation in redevelopment work, however, the property owner is still not given a veto right and no more is required of the redevelopment agency than it exercise a reasonable and good faith effort in this regard. *Laconia Housing & Redevelopment Authority v. Emanuel*, 111 N.H. 253, 281 A.2d 159, 161 (1971); *Fellom v. Redevelopment Agency*, 157 Cal. App. 2d 243, 320 P.2d 884, 889 (1958).

█ We have carefully reviewed our State's Urban Renewal Law, the ordinances referred to above, and the Pike Place Plan. There is nothing in any of these which mandates owner participation in the redevelopment work.[9] The preference they require in executing the renewal or redevelopment plan is a preference for *private enterprise* generally, as contrasted to public agencies. *See Berman v. Parker*, 348 U.S. 26, 30, 99 L. Ed. 27, 27 S. Ct. 98 (1954). The City is also extended some measure of discretion in the exercise of this preference.

Under the Pike Place Plan, the City could well have entered into an owner-participation agreement with Loutsis which would have permitted Loutsis to continue in its ownership of the hotel and itself rehabilitate the property in conformity with the requirements of the Pike Place Plan. The City chose not to do so. There was testimony on behalf of the City that it was not architecturally feasible to develop the Cliff House by itself. The trial court's findings of fact negate any abuse of discretion on the part of the City in deciding to condemn the Cliff House. There was therefore no error in this regard. *Miller v. Tacoma*, 61 Wn.2d 374, 390, 378 P.2d 464 (1963).

ISSUE FOUR.

---

[9] Statutes extending sales preferences to displaced persons and business have been criticized for the number of serious practical problems which they engender. These include problems attendant on plans requiring the marshaling of contiguous parcels or arrangements of improvements that will not permit reconstruction of the same type of improvement on the same property as before or for the same purposes for which the property was previously used. *See* Brownfield, *The Disposition Problem in Urban Renewal*, 25 Law & Contemp. Prob. 732 (1960).

CONCLUSION. The improper conduct by some city employees working on the urban renewal project was not of such a nature as to invalidate the condemnation.

Loutsis argues in its brief that "[d]uring the investigation of the Loutsis' property prior to its condemnation, a City employee made a copy of the Loutsis' family key to the premises without their permission," and further, that "[u]sing this key, illegal and unauthorized entries were made by City representatives on the property. . . ." Although the trial court made no findings as to this, there is evidence of some misconduct of this kind in the record which was not controverted by the City.

Furthermore, we also observe in the record that one of the City's urban renewal personnel testified on cross-examination that after the Loutsis' property was acquired it was to be sold without putting it up for bids.[10]

Loutsis asks that the condemnation be set aside because of misconduct by city employees. The total answer by the City to Loutsis' assignment of error concerning misconduct is stated in brief of respondent filed on behalf of the City, that "[n]o trial court finding was requested or entered on this matter, accordingly it can not now be considered." The City cites no authority for this proposition and we know of none.

There is nothing in the Urban Renewal Law which gave city employees a right to enter upon Loutsis' property without permission. The city employees had the right to

---

[10]The City employee was asked and answered in pertinent part:

"Q What has the City decided to do with the Loutsis property?

"A After the condemnation?

"Q Well, will the City retain ownership in that property?

"A The City will assemble it and resell it to some non-profit qualified developer here.

"Q *Will you put the property up for bids?*

"A *No.*

"Q The City is going to redevelop and then sell that property?

"A They will sell it with the adjacent property for rehabilitation by the purchaser.

"Q So the City is going to resell it and then someone else is going to develop it?

"A Right." (Italics ours.)

enter the building to make necessary surveys and appraisals providing they had the owner's permission. In the event such permission was refused, the City was entitled to obtain a court order to authorize such entry, but such order could also serve to protect Loutsis' rights as well. RCW 35.81.070(3).

Furthermore, the City has no right to condemn property for urban renewal purposes and then sell it to whomever the City or some of its employees might wish without putting it up for competitive bids. The Urban Renewal Law provides in part:

> A municipality may dispose of real property in an urban renewal area to private persons *only* under such reasonable competitive bidding procedures as it shall prescribe or as hereinafter provided in this subsection.

(Italics ours.) RCW 35.81.090(2).

Losing one's property by condemnation is rarely a pleasant experience. That circumstance is rendered even more unhappy where, as under the Urban Renewal Law, the property acquired by condemnation can then be leased or resold by the City to private persons. To then add trespass by city employees and an unfounded statement that the City would sell the property without putting it up for competitive bidding served to add insult to the legal injury caused the owner by the taking of the property.

Fortunately for the republic, the overwhelming majority of public employees are hardworking, dedicated people who are conscientiously trying to do a good job. Sometimes they must function under handicaps not generally understood and ordinarily receive little or no thanks save for the satisfaction of a job well done.

As in any large group, however, there are always a few who, like the proverbial bad apple, can spoil the barrel. They are the ones who because of natural arrogance, outright carelessness, or simply a lack of concern fostered by not being personally responsible to the electorate seem to operate from the entirely mistaken premise that the tax-

payer is working for them, rather than the other way around.

That this is not merely a minor annoyance is proven every time the word "bureaucrat" is pronounced as though it were an epithet, and by the frustration currently felt by so many citizens with all levels of their government. This is also the kind of conduct which could not do more to harm the urban renewal program and its vital goal of curing urban blight if it were calculated to do so. Even the wisest policies established by the most eminent leaders, be they federal, state, or local, will not be satisfactory if they are not well administered and carried out. The gauge of excellence is not the law under which public employees function, but is the care, conscience, and intelligence with which it is applied.

Volumes have been written about the legal, constitutional, and social aspects of urban renewal, but little has been written about its administration. Perhaps the most perceptive words which have been said on the subject are those of the late Judge Simon E. Soboloff. When Judge Soboloff was Solicitor General of the United States he argued the landmark urban renewal case of *Berman v. Parker, supra,* for the government before the United States Supreme Court. Later he addressed a convention[11] of housing and redevelopment officials on the subject:

> To say that a specific act is constitutional is to say no more than that the constitution does not prohibit government from acting. Whether government should take a particular action is not for the courts to decide. The wisdom of governmental action is the responsibility of legislators and administrators. An act may be constitutional but exceedingly unwise and, by the same token, we all know that acts thought exceedingly wise by some

---

[11]Remarks at the Annual Convention of National Association of Housing and Redevelopment officials at Cleveland, Ohio, on October 19, 1955, reported in Osgood and Zwerner, *Rehabilitation and Conservation,* 25 Law & Contemp. Prob. 705, at 717 (1960). After serving as Solicitor General, he became Judge Simon E. Soboloff of the United States Circuit Court of Appeals, 4th Circuit, and later served as Chief Judge of that court.

people may be very unconstitutional. It is, therefore, one thing to say that the decisions of our supreme courts indicate that the states have the power drastically to regulate and even take private property for the purposes of urban renewal. It is quite another thing to say that there are no limits imposed upon cities, redevelopment commissions, health departments, and housing authorities. These powers must be first clearly delegated by the people and then exercised with prudence, reason, and care. Ill considered exercises of power that the public will not accept, although constitutional, may work more mischief to urban renewal than an adverse court decision.

To those of you who share the responsibility for these activities, allow me a word of admonition. The most complete legislative authorization, the clearest sanction of your supreme court, and the most workable of workable programs are no better than the wisdom, the understanding, and devotion applied by those who administer and carry out the day-to-day work. The overriding public interest that gives you power must be constantly nurtured with understanding and you must act with due moderation and mindfulness of the rights and needs of an individual.

As to the case at hand, if arbitrary conduct by city employees of the degree evinced here had been responsible for the City designating the Cliff House as property to be condemned, we would have no hesitancy in reversing. However, as the trial court found, that was not the situation.

Loutsis asks that we invalidate the condemnation on the basis of the "appearance of fairness doctrine." That doctrine applies only to hearings and not to actions by municipal employees of the sort here involved. *Fleming v. Tacoma*, 81 Wn.2d 292, 295, 502 P.2d 327 (1972); Black, *Public Hearings—An Appearance of Fairness*, 5 Gonzaga L. Rev. 324 (1970).

Loutsis' remedy for any damages caused to it by trespass of city employees is by a separate tort action against the City and/or against the offending municipal employees. Loutsis' property has not yet been acquired by the City, and because the City cannot sell property which it does not

yet have, the stated intention to sell the Cliff House without calling for competitive bids is not yet actionable.

.ISSUE FIVE.

CONCLUSION. There being substantial evidence to sustain the trial court's findings of fact, they will not be disturbed on this appeal.

The remaining issues in this case are primarily factual. Loutsis has assigned error to eight of the trial court's nine findings of fact. It has similarly assigned error to all of its conclusions of law.

 We have carefully reviewed the entire record as submitted. The trial court's findings of fact are supported by substantial evidence and we therefore will not substitute our findings for those of the trial court. *Thorndike v. Hesperian Orchards, Inc.*, 54 Wn.2d 570, 575, 343 P.2d 183 (1959); *Charles Pankow, Inc. v. Holman Properties, Inc.*, 13 Wn. App. 537, 542, 536 P.2d 28 (1975).

Furthermore, the findings of fact sustain the trial court's conclusions of law.[12] The other points made by Loutsis in its briefs and oral argument before this court all relate to

---

[12]The trial court's conclusions of law were as follows:

"1. The Urban Renewal Law is constitutional.

"2. Seattle Ordinances 98016 and 102916: (a) are supported by sufficient findings and such findings are supported by sufficient evidence and are neither arbitrary nor capricious; (b) set forth and apply criteria which will support a constitutional public use; (c) were enacted with full compliance with all applicable statutes and laws after protesting property owners were given adequate opportunity to be heard, and; (d) are constitutional and lawful in all respects so far as this case is concerned.

"3. Seattle Ordinance 104709 providing for the acquisition by condemnation of the subject property, complies with the urban renewal laws and the urban renewal plan, and is in all respects valid and constitutional.

"4. The City of Seattle has followed the prescribed procedure, and all acts of the City Council are legal and constitutional.

".5. The object for which the property described in the petition in this action is a public object and a public use to wit: the Pike Place Urban Renewal Project; said property and property rights are required and necessary for said Pike Place Urban Renewal Project and are essential for completion of the project; and the taking of said property and property rights by the petitioner for such public use is necessary."

the dispositive issues that we have here dealt with and are without additional merit.

The trial court's adjudication of public use and necessity is affirmed.

WILLIAMS, C.J., and CALLOW, J., concur.

Petition for rehearing denied February 10, 1977.

Review denied by Supreme Court July 27, 1977.