[No. 48358-2. En Banc. May 5, 1983.]

PEGGY ZEHRING, ET AL, *Respondents,* v. THE CITY OF BELLEVUE, ET AL, *Petitioners.*

*Linda Youngs, City Attorney, Richard Gidley, Assistant,* and *Jones, Grey & Bayley, P.S.,* by *John L. West* and *E. Michele Moquin,* for petitioners.

*Robert E. Prince* and *Gordon A. Woodley,* for respondents.

WILLIAMS, C.J.—The issue in this case is whether a city planning commissioner's participation in design review hearings for a proposed office building violated the appearance of fairness doctrine when the commissioner purchased shares in the proponent corporation shortly after approval of the proposed design. The trial court found no violation of the appearance of fairness doctrine and granted partial summary judgment on that issue. The Court of Appeals, Division One, found an appearance of fairness violation and, in an unpublished opinion, reversed without prejudice to further proceedings in which the planning commissioner did not participate. The Court of Appeals affirmed on all other issues. *Zehring v. Bellevue,* 30 Wn. App. 1017 (1981). For the reasons set forth below, we affirm the Court of Appeals.

Respondents, Peggy Zehring and Joan O'Connor, brought this declaratory judgment action to invalidate the rezone of certain real property in Bellevue from a residential classification to a limited office use classification. The suit also challenged the Bellevue Planning Commission's building design approval and issuance of a building permit to Chem–Nuclear Systems, Inc. (Chem–Nuclear), owner of the property, to construct a 2–story office complex thereon.

In December of 1974, one of the owners of a parcel of real estate in Bellevue applied to the Bellevue City Planning Department to have approximately 4.75 acres rezoned from single–family residential use to limited office use. The department staff reviewed the application until June of 1975. On June 25, 1975, acting on the advice of its staff that the rezone would have no significant environmental impact

under the State Environmental Policy Act of 1971 (SEPA), RCW 43.21C, the Bellevue Planning Commission recommended to the Bellevue City Council that the property be rezoned subject to particular conditions. Some of the conditions, including a provision for design review of any building over one story proposed for the property, were later included in a concomitant zoning agreement signed by the owners of the property and the City of Bellevue. On December 13, 1976, pursuant to public notice and at a public meeting, the Bellevue City Council adopted the planning commission recommendations and enacted an ordinance rezoning the property. The rezone, however, was specifically conditioned on full compliance by the owners of the property and their successors with the terms of the concomitant zoning agreement. The full text of the ordinance was then published in a local newspaper and the concomitant zoning agreement was filed in King County as a matter of public record.

Respondents Zehring and O'Connor purchased homes directly across the street from the property in May of 1977. Their realtors apparently told them the property was zoned for a 1–story office building instead of the 2–story office use conditionally approved by the City Council.

In January of 1978, 13 months following adoption of the rezone, Chem–Nuclear contracted to purchase the property in order to construct an office facility to house the company's corporate headquarters. While still in the process of acquiring the property, Chem–Nuclear filed an application with the Bellevue Planning Department for a building permit to allow construction of the office facility. At the same time, pursuant to the concomitant zoning agreement, Chem–Nuclear submitted plans to the Bellevue Planning Commission for design review of its proposed 2–story office complex.

Sometime in July of 1978, Planning Commissioner Dean Tibbott was approached by his stockbroker with a suggestion to purchase Chem–Nuclear stock. Tibbott, aware of the permit applications, declined. Thereafter on July 26

and August 9, 1978, Tibbott participated in public hearings conducted by the Commission to consider Chem–Nuclear's proposed office facility designs. On August 9, 1978, the Planning Commission approved the 2–story building design with modifications and subject to subsequent review and approval of a landscaping plan.

Sometime between August 9 and August 17, 1978, Tibbott met with his stockbroker and authorized the purchase of 1,000 shares of Chem–Nuclear stock at approximately $14 per share. At the time, Chem–Nuclear had 1,971,479 shares outstanding. The purchase was completed on August 17, 1978. On August 16, 1978, Tibbott participated in a public meeting in which the Planning Commission denied a motion to reconsider its approval of Chem–Nuclear's building plans. The reconsideration motion was not an agenda item for that meeting and was defeated unanimously.

Shortly before the Planning Commission's meeting on December 13, 1978, Tibbott learned that Chem–Nuclear's landscape design review was on the agenda, so he did not participate in the Commission's approval of the landscape design.

Bellevue's environmental coordinator reviewed the potential impact of the Chem–Nuclear project on the surrounding environment and issued a declaration of nonsignificance. Respondents, through their counsel, appealed to the city hearing examiner who affirmed the environmental coordinator's assessment. On March 9, 1979, the requested building permit was issued to Chem–Nuclear.

Respondents filed this lawsuit on September 27, 1978. Some of their claims were dismissed by summary judgment orders; the remaining claims were dismissed after trial to the court. Separate appeals were taken to this court and consolidated after being transferred to Division One of the Court of Appeals. In summary, the trial court held: (1) the City did not have to apply SEPA guidelines in making its environmental assessment of the property rezone; (2) Commissioner Tibbott's participation in the design review proceedings did not violate the appearance of fairness doctrine;

(3) the design review proceedings complied with the concomitant zoning agreement; (4) the environmental coordinator's determination of nonsignificance was not biased or erroneous; (5) the 1976 rezone was proper and the claims of Zehring and O'Connor on this issue were barred by laches; (6) the Commission's design review decision was valid; and (7) the hearing examiner's determination of no significant environmental impact was neither clearly erroneous nor arbitrary and capricious.

In an unpublished opinion, the Court of Appeals affirmed on all issues except the appearance of fairness issue. *Zehring v. Bellevue, supra.* The court held Commissioner Tibbott's purchase of 1,000 shares of Chem–Nuclear stock created the appearance of unfairness. Therefore, the court remanded for the Planning Commission's reconsideration of Chem–Nuclear's building design application without the participation of Commissioner Tibbott. Chem–Nuclear and the City of Bellevue thereafter moved for reconsideration, but Zehring and O'Connor did not. The motion was denied and this court accepted petitioners' petition for review on the appearance of fairness issue only.

Since the trial court decided the appearance of fairness issue on an order of summary judgment, this court must engage in the same inquiry as the trial court. *Highline Sch. Dist. 401 v. Port of Seattle,* 87 Wn.2d 6, 15, 548 P.2d 1085 (1976). The motion may not be granted unless there is no genuine issue as to any material fact, CR 56(c), and the court must consider all facts submitted and all reasonable inferences from the facts in the light most favorable to the nonmoving party. *Yakima Fruit & Cold Storage Co. v. Central Heating & Plumbing Co.,* 81 Wn.2d 528, 530, 503 P.2d 108 (1972). That both parties moved for summary judgment does not alter the relevant inquiry concerning the factual and legal issues presented. *Sarruf v. Miller,* 90 Wn.2d 880, 883, 586 P.2d 466 (1978).

The appearance of fairness doctrine was first developed in 1969, with our decision in *Smith v. Skagit Cy.,* 75 Wn.2d 715, 453 P.2d 832 (1969). In *Smith,* the county

planning commission invited only advocates of a proposed rezone to a closed session, deliberately excluding opponents of the zoning change. *Smith,* at 719. This court invalidated the rezone on the basis of the appearance of fairness doctrine, which we summarized as follows:

> In short, when the law which calls for public hearings gives the public not only the right to attend but the right to be heard as well, the hearings must not only be fair but must *appear* to be so. It is a situation where appearances are quite as important as substance.

*Smith,* at 733. In essence, the doctrine was developed to preserve the highest public confidence in governmental processes which bring about zoning changes or regulate land use. *Swift v. Island Cy.,* 87 Wn.2d 348, 361, 552 P.2d 175 (1976); *Evergreen Sch. Dist. 114 v. Clark Cy. Comm. on Sch. Dist. Org.,* 27 Wn. App. 826, 831, 621 P.2d 770 (1980).

The test of whether the appearance of fairness doctrine has been violated is set forth in *Swift,* as follows:

> Would a disinterested person, having been apprised of the totality of a board member's personal interest in a matter being acted upon, be reasonably justified in thinking that partiality may exist? If answered in the affirmative, such deliberations, and any course of conduct reached thereon, should be voided.

*Swift,* at 361. *See also Hill v. Department of Labor & Indus.,* 90 Wn.2d 276, 281, 580 P.2d 636 (1978). The doctrine applies to quasi–judicial proceedings, whereas legislative action is measured by the arbitrary or capricious standard. *Westside Hilltop Survival Comm. v. King Cy.,* 96 Wn.2d 171, 176, 634 P.2d 862 (1981). The first question, then, is whether a building design review hearing is legislative or quasi judicial in nature.

In *Fleming v. Tacoma,* 81 Wn.2d 292, 502 P.2d 327 (1972), we considered the action of the Tacoma City Council in a rezone matter in light of the appearance of fairness doctrine. In so doing, we identified three factors differentiating quasi–judicial rezone actions from the legislative actions of a zoning board. First, rezones involve decisions

having a far greater impact on one group of citizens than the public generally; the decision maker must decide between proponents and opponents. Second, a rezone has localized applicability, usually affecting only the immediate area being rezoned. Finally, statutes, charters, or ordinances require mandatory rezone hearings. Most legislative hearings, on the other hand, are generally discretionary. *Fleming,* at 299.

In *Polygon Corp. v. Seattle,* 90 Wn.2d 59, 67–68, 578 P.2d 1309 (1978), we interpreted *Smith* as requiring not only that the decision be quasi judicial in nature, but also that any public hearing be required by law:

> The appearance of fairness doctrine was first applied in *Smith v. Skagit County,* 75 Wn.2d 715, 453 P.2d 832 (1969), to provide a due–process type standard for statutorily *required hearings* of a legislative body acting in a quasi–judicial capacity. It has never been applied to administrative action, except where a public hearing was required by statute. *See Seattle v. Loutsis Inv. Co.,* 16 Wn. App. 158, 173, 554 P.2d 379 (1976). The appearance of fairness requirements which have been developed for hearings are inappropriate in the building permit application process which necessarily involves frequent informal contacts between the applicant and employees of the building department.

In *Smith* we noted the appearance of fairness doctrine was applicable under the following circumstances:

> It is axiomatic that, *whenever the law requires a hearing of any sort as a condition precedent to the power to proceed,* it means a fair hearing, a hearing not only fair in substance, but fair in appearance as well.

(Italics ours.) *Smith,* at 739. The appearance of fairness doctrine applies to required hearings because "[t]he fact that these hearings are required is itself recognition of the fact that the decision making process must be more sensitive to the rights of the individual citizen involved." *Fleming,* at 299.

From the above cases, a rule may be formulated that whenever an administrative body, acting in a legislative or

quasi–judicial capacity, conducts a public hearing, required by law, to decide the rights of individual parties to engage in or refrain from some activity, the appearance of fairness doctrine should apply.

The three factors set out in *Fleming* as indicative of quasi–judicial action are all met in the building design review hearings in this case. First, the parties whose interests are involved in this case are readily identifiable. The decision of whether to approve or disapprove the 2–story building proposal will have a far greater impact on the parties to this lawsuit than on the public in general. In short, the decision as to whether Chem–Nuclear's building design will cause a substantial visual intrusion resembles an adjudication between the rights sought by the proponents and those claimed by the opponents of the project. Second, the decision in the present case will apply only to the property involved in this case, not throughout an entire geographical area within the municipal jurisdiction. Finally, although there is no specific public hearing requirement as to building design review proceedings, there is such a requirement as to zoning reclassifications. *See* former sections 18.64.010 and 18.64.050 of the Bellevue City Code. There are a number of factors in this case indicating the building design review proceedings were nothing more than a continuation or postponement of the final zoning reclassification.

In the ordinance initially rezoning the property, the following language was used:

> *This classification from RS–9600 to B–2L is conditioned on full compliance* by the owners of said property and their heirs, assigns, grantees, and successors in interest, *with the terms and conditions of that certain concomitant zoning agreement* and conditional easement attached thereto, . . .

(Italics ours.) Plaintiff's exhibit 17. The concomitant zoning agreement, referred to in the above ordinance, provides that:

> 5. In addition to all other remedies available to the City by law, *the City reserves the right to revoke the*

*rezoning of the above–described property should the Owners fail to comply with any of the terms and conditions of this agreement.*

(Italics ours.) Plaintiff's exhibit 19. When the above documents are read together, it seems clear that the final decision to rezone the property was postponed until such time as the conditions of the agreement were satisfied. One of the most important issues, whether a 2–story building would "visually intrude" on residential areas to the west of the property, was avoided at the time of the rezone ordinance by postponing that decision until the property was developed sometime in the future. To assure compliance with the terms and conditions of the concomitant zoning agreement, final approval of the rezone specifically was withheld until later approval of the building design by the Planning Commission and the Bellevue City Council. Under these circumstances, we believe the building design review hearings were nothing more than a continuation or postponement of the ultimate rezoning decision. As part of the continuing rezone process, public hearings were required by law. *See* former sections 18.64.010 and 18.64-.040 of the Bellevue City Code.

From the above factors, we conclude the building design review hearings in this case were the type of quasi–judicial proceedings to which the appearance of fairness doctrine was intended to apply. We now turn to the application of the appearance of fairness doctrine to the conduct of Commissioner Tibbott in this case.

The case factually closest to the one now before us is the case of *Fleming.* That case involved an alleged conflict of interest of a city councilman who accepted employment as an attorney with the successful proponents of a zoning amendment less than 48 hours after voting in favor of the rezone. At the time of his participation, the councilman did not have a direct interest in the outcome, but the acceptance of employment so soon after approval of the rezone was termed "devastating". *Fleming,* at 300. We invoked the appearance of fairness doctrine to invalidate the ordinance

because the inference that such employment was arranged before the vote could not be ignored.

In the present case, Commissioner Tibbott recognized a potential appearance of fairness problem at two different points: first, when approached by his stockbroker to purchase Chem–Nuclear stock before the hearing; second, when he disqualified himself from the landscape approval hearing. At the time of the August 9 and August 16 votes, Tibbott did not actually own the stock. Between those two hearings, however, he ordered the purchase of 1,000 shares of stock and the transaction was completed on August 17, 1978. While Tibbott did not actually own the shares at the time of his participation in the reconsideration hearing, he had committed himself to the purchase.

■ Although Tibbott's purchase of 1,000 shares may be insignificant to Chem–Nuclear in that it had some 1.9 million outstanding shares, the real test is the importance of the personal interest in Chem–Nuclear to Tibbott himself. Further, the fact that the measures would have passed without Tibbott's vote is irrelevant, even if the other members are impartial, because the appearance of unfairness taints the entire proceeding. *Buell v. Bremerton,* 80 Wn.2d 518, 525, 495 P.2d 1358 (1972).

The final resolution of this question requires application of the test quoted above from *Swift v. Island Cy.,* 87 Wn.2d 348, 361, 552 P.2d 175 (1976) as to whether a disinterested person, having been apprised of Commissioner Tibbott's stock subscription before the August 16, 1978, meeting, would be reasonably justified in believing such an interest impugned his impartiality. Keeping in mind the fact that this issue was decided on an order of summary judgment, we must view the facts of this case and the inferences therefrom in the light most favorable to respondents Zehring and O'Connor. *See Yakima Fruit & Cold Storage Co. v. Central Heating & Plumbing Co.,* 81 Wn.2d 528, 503 P.2d 108 (1972). Under these circumstances, we must conclude Commissioner Tibbott's participation in the August 16, 1978, hearing after having committed himself to pur-

chasing 1,000 shares of stock in the proponent company demonstrates a potential financial interest in the outcome of these hearings and thus violates the appearance of fairness doctrine. As we stated in *Buell v. Bremerton, supra* at 523:

> The importance of the appearance of fairness has resulted in the recognition that *it is necessary only to show an interest which might have influenced a member of the commission* and not that it actually so affected him.

(Italics ours.) Viewing the facts and inferences in the light most favorable to respondents, we find they have shown an interest which might have affected Commissioner Tibbott's impartiality. That portion of the trial court's order on summary judgment deciding that the appearance of fairness doctrine was not violated in these design review hearings is reversed without prejudice to further proceedings in which Commissioner Dean Tibbott does not participate.

The Court of Appeals is affirmed.

ROSELLINI, BRACHTENBACH, DORE, and PEARSON, JJ., concur.

UTTER, J. (dissenting)—I dissent inasmuch as this opinion perpetuates the unfortunate morass this court has constructed in the development of its appearance of fairness doctrine. For reasons I have expressed in my concurring opinion in *Harris v. Hornbaker*, 98 Wn.2d 650, 658 P.2d 1219 (1983), I believe the doctrine is unwise, unnecessary and unfathomable. This is illustrated by the fact that the majority in *Harris*, written by Justice Brachtenbach, expressly rejects the application of the doctrine as being mandated by a legislatively required hearing. There the court stated, at page 660:

> A statutory public hearing by a legislative body is not the talisman for invoking the appearance of fairness doctrine. If it were, we would unfairly constrain the Legislature in its attempt to provide opportunities for public participation in legislative decisions. If by requiring a

public hearing the Legislature would implicitly force its subdivisions to adhere to a full panoply of adjudicatory safeguards, it might well decide to eliminate such hearings altogether. Prior cases should not be interpreted as indicating that a decision becomes quasi judicial and triggers the appearance of fairness doctrine by the mere fact that a hearing is required by statute. *See Polygon Corp. v. Seattle,* 90 Wn.2d 59, 67–68, 578 P.2d 1309 (1978).

In this case we return to the concept repudiated in *Harris* and even cite *Polygon Corp. v. Seattle,* 90 Wn.2d 59, 578 P.2d 1309 (1978) as supporting the required application of the appearance of fairness doctrine to public hearings required by law. The majority states, after citing *Polygon,* at pages 495–96.

> The appearance of fairness doctrine applies to required hearings because "[t]he fact that these hearings are required is itself recognition of the fact that the decision making process must be more sensitive to the rights of the individual citizen involved." *Fleming [v. Tacoma,* 81 Wn.2d 292, 299, 502 P.2d 327 (1972)].
>
> From the above cases, a rule may be formulated that whenever an administrative body, acting in a legislative or quasi–judicial capacity, conducts a public hearing, required by law, to decide the rights of individual parties to engage in or refrain from some activity, the appearance of fairness doctrine should apply.

It may be that these statements are reconcilable, but I have difficulty in doing so. What is more, I am certain the lawyers of this state will have great difficulty with an already obscure doctrine when we ourselves are at best uncertain as to its jurisprudential roots and how it should be applied. As stated in my concurring opinion in *Harris,* I see no reason why fact finders should be held to any standards beyond those required of judicial officers. If we were to apply such a rule, as I have further elaborated in my *Harris* concurring opinion, we would have a long developed, substantial body of law which lawyers, citizens and government could apply without the unnecessary confusion we now engender. I

would affirm the trial court and reverse the Court of Appeals.

STAFFORD, DOLLIVER, and DIMMICK, JJ., concur with UTTER, J.

Reconsideration granted by Supreme Court October 11, 1983.