[No. 44016. En Banc. July 22, 1976.]

SWIFT, ET AL, *Appellants*, v. ISLAND COUNTY, ET AL, *Respondents*.

Roger M. Leed (of *Schroeter, Jackson, Goldmark & Bender*), for appellants.

*David F. Thiele, Prosecuting Attorney,* and *David B. Strong, Chief Deputy,* for respondent Island County.

*Slade Gorton, Attorney General,* and *James A. Humphrey, Assistant,* for respondent Department of Social and Health Services.

*Slade Gorton, Attorney General, Charles B. Roe, Jr., Senior Assistant,* and *Robert V. Jensen, Assistant,* for respondent Department of Ecology.

*Bogle & Gates, John C. Coughenour, Dale B. Ramerman,* and *Charles R. Blumenfeld,* for respondents Dillingham Development Co., et al.

WRIGHT, J.—This appeal involves a challenge to a determination made by the planning director of Island County that no impact statement under RCW 43.21C was required for the approval of three plats and building permits for a development known as the "Seabreeze" development in Keystone Harbor, Whidbey Island. The approval of two plats which subdivided the shoreline portion of that development is being attacked. The questions on appeal are: (1) What standard of review is appropriate when a court reviews an agency "threshold" determination under the State

Environmental Policy Act (SEPA) and was that standard met? (2) Did the county take a "piecemeal" approach to Shoreline Management Act and State Environmental Policy Act questions presented by a single project? (3) Can agencies issue approvals for a development without seeking assurances that SEPA has been complied with? (4) When may a court shift the burden of attorneys' fees under the "private attorney general" doctrine? (5) Was the appearance of fairness violated?

We hold as follows: (1) The test to be applied is the "clearly erroneous" test. A substantial impact was demonstrated by numerous agency reports so that the director's decision to disregard the reports and enter the finding "no substantial impact," thereby bypassing the preparation of an environmental impact statement altogether, is clearly erroneous. (2) There was no improper "piecemealing" in this case. (3) We find it unnecessary to decide the question of whether agencies can issue approvals without seeking assurances that SEPA has been complied with. Any expression we might make on that question would be in the nature of an advisory opinion. (4) The theory of "private attorney general" has never been adopted in this jurisdiction, and, therefore, forms no basis upon which attorneys' fees can be awarded. (5) The appearance of fairness was violated in this case.

The facts will be stated as briefly as possible. The area involved is near the Keystone Ferry Landing which is the easterly terminus of the ferry route from Port Townsend to Whidbey Island. The area is of historical significance. It was the first permanent settlement on the island. Colonel Samuel Crockett established a donation land claim there in 1851 which still bears his name, as does Crockett Lake. Another early settler was Dr. J. C. Kellogg who settled in the area in 1853. The Kellogg land later became a part of Fort Casey. A lighthouse was also located on the Kellogg property. Some visible remains of the original buildings may still be seen. The historical significance of the area is best summarized by saying it is included in the Central

Whidbey Island Historical District, which has been placed in the National Register of Historic Sites.

Crockett Lake is separated from the waters of Puget Sound by a narrow strip of land. There is some connection between the salt water and the lake. Although there was for some time a tide gate, that seems now to be inoperative.

The land upon which the proposed plats are located is, and for many years has been, much used for recreational purposes. It is, however, private property. Respondents point out that any recreational use of their land now, or in the past, is the activity of trespassers.

In 1890 two townsites known as Brooklyn and Chicago were platted on part of the ground now in question. These townsites consisted of a large number of very small lots, only a few of which were ever sold.

Starting in about 1971, applications were made for re-platting of the old sites of Brooklyn and Chicago. The applications were made by a joint venture consisting of Dillingham Development Company (Dillingham), a Hawaiian concern, and First Realty, Inc. (First Realty), a concern involved in the development of areas on Whidbey Island.

On February 8, 1972, the Island County Planning Commission rejected the plat for a number of reasons. This was done on the recommendation of the planning director, Sydney W. Glover. The action of the planning commission was appealed to the board of county commissioners of which board one J. R. Vanderzicht was then chairman. Vanderzicht was also a stockholder and chairman of the board of directors of the Island Savings and Loan Association (Association). The Association was listed as a dedicator on the plat of Keystone Estates Division No. 2, a major part of the Seabreeze development. Vanderzicht signed the dedication on behalf of the Association. From 1972 through the present, the Association has held a mortgagee's interest in a portion of the property to be included within the Seabreeze development. The county commissioners, in a motion seconded by Commissioner Vanderzicht, overruled the plan-

ning commission and gave preliminary approval to the Keystone Shores Plat in April 1972.

Before the county commissioners acted on the appeal; Vanderzicht had been contacted by Robert Hansen of First Realty. On March 23, 1972, Hansen, on behalf of First Realty, wrote a report to Dillingham, a part of which reads as follows:

Mr. Vandersythe [sic] is a very astute businessman who is the senior County Commissioner and purported to be the strongest leader in the County Government. After explaining the history of our proposed plats and the frustrations encountered with the County Planner, County Sanitarian, and possibly, the County Prosecutor in the delay of this plat, he proceeded to advise me that there was little question but that all three Commissioners were going to overrule the Planning Commission and approve the preliminary plat on April 10th. He went on to explain that we had been a victim of circumstances, with a new Planner who is hired by and responsible to a Planning Commission; with a Sanitarian who, in December, was being criticized by his superiors in the State Health Department for approving septic tank permits . . . without site inspection where soils have been unsuitable for septic tank purposes; with vague guidelines handed down by the Attorney General for the Shorelines Management Act, and with an ecology group that had recently become organized.

He further explained there was no question but that the Planning Commissioner representing the area where Keystone is located is dead set against any development of Keystone.

. . .

He suggested that we give some support to the County Commissioners to rationalize the overruling of the Planning Commission's denial.

. . .

Barring any unforeseen legal maneuvers, we should have approval on April 10.

Mr. Hansen proved to be accurate in his prediction. On April 10, 1972, the plat was approved. Vanderzicht seconded the motion to approve and then voted for the approval. Thereafter, development of the project proceeded

rapidly. The developers decided to divide the preliminary plat for final platting purposes, and proceeded to seek final plat approval for Keystone Shores Division No. 1 and Keystone Shores Division No. 2, which replaced the old plats of Brooklyn and Chicago. Approval of these designations was given by the board of commissioners in February and April of 1973.

In the summer of 1973, physical work on the site started with the building of roads and digging of ditches for water and sewer lines. At about the same time a real estate sales firm was employed by the developers and moved in with the usual flags and signs. The residents of the area only then learned what was proposed and started this proceeding on August 31, 1973.

In addition to the above, the developers obtained two shoreline substantial development permits for the Keystone Shores and Keystone Estates plats. The developers likewise were granted approvals of their water systems by the Department of Social and Health Services. To overcome that department's objection to septic tanks, a contract was made with the Port of Coupeville to operate a sewage treatment plant. The developers sought approval of the design of the sewage facilities from the Department of Ecology. At the time of this appeal, final approval of these facilities had not been obtained.

Shortly after work was begun, appellants made demand on the Attorney General and the Prosecuting Attorney to halt development on the basis that no environmental impact statement had been prepared under the State Environmental Policy Act of 1971 or the Shoreline Management Act of 1971. The primary environmental concern was the effect the project would have on Crockett Lake, whose surface waters and wetlands are unquestionably valuable to waterfowl and shorebirds. Concern was also expressed that a development the size of the Seabreeze Estates development would unduly congest the Admiralty Head/Admiralty Bay area. This area contains four highly attended points of interest, *i.e.*, Fort Casey Historical State Park;

Keystone Harbor; Keystone Jetty, a separate underwater park; and Keystone Ferry Landing. Appellants' demand was not heeded, and, therefore, appellants commenced an action in Island County Superior Court seeking an injunction to halt work and an order directing defendant Island County to comply with the provisions in RCW 43.21C.

Before any hearing in the case, Dillingham and First Realty were permitted to intervene. They then moved to require the joinder of the Department of Ecology, which motion was also granted.

Plaintiffs (appellants) moved for a summary judgment and an injunction. As mentioned above, the developers were not in the litigation at its inception but soon came in at their own request. The original application was for an injunction against the governmental entities. Later, however, an injunction was also sought against the developers. Plaintiffs' applications for summary judgment and an injunction were denied.

Plaintiffs then sought a writ of mandamus in the Court of Appeals to require the granting of an injunction. That application was denied and the matter went back to the Superior Court for trial. The trial started December 11, 1973, and had proceeded about a week and a half.

Plaintiffs had moved at the start of the trial to remand for the reason the record of proceedings prior to trial was inadequate for a proper review. The motion was taken under advisement while the trial proceeded. After several witnesses had testified, plaintiffs called Sydney W. Glover, the planning director of Island County.

Glover's testimony was rather extensive. He testified he had in fact made a determination that the Seabreeze development had no environmental impact and that no impact statement was needed. He admitted, however, he had made no record of that decision, had never told anyone of his decision, and had consulted with no one about the decision. At that point, the trial court recessed the trial and remanded the matter to the Island County Board of County

Commissioners for purposes of further consideration by said board and by the planning director and the planning commission. The court held by order of remand on January 24, 1974, in part, that:

 1. The matter of whether or not "a detailed statement," pursuant to chapter 43.21C RCW, should be prepared with respect to the Seabreeze development, is remanded to Island County which shall make a determination concerning such matter and a reviewable record in support thereof.

Glover then made a written statement that the project had no significance. His determination in this regard was contrary to the views expressed and communicated to him by the United States Department of the Interior, Fish, and Wildlife Service; State Parks and Recreation Commission; State Department of Game; State Department of Ecology; the Central Whidbey Island Historic Preservation Advisory Committee; and Terence Wahl, an authority on bird life in Washington.

After the determination by the planning director, the trial resumed on May 15, 1974. Plaintiffs recalled Glover and called several other witnesses, after which, plaintiffs rested their case. At that point the court granted a motion for dismissal. Plaintiffs appealed to the Court of Appeals, from whence it was transferred to this court.

Plaintiffs' appeal is both from the judgment of dismissal and from the refusal of the trial court to grant to plaintiffs a judgment for attorneys' fees and costs.

■ RCW 43.21C.090 provides that when an agency makes a determination relative to the absence of the requirements of a detailed statement, the decision of that agency is to be accorded "substantial weight." In *Norway Hill Preservation & Protection Ass'n v. King County Council*, 87 Wn.2d 267, 552 P.2d 674 (1976) (*Norway Hill Association*) this court *sub silentio* construed the words "substantial weight" in RCW 43.21C.090 to mean the same

standard of review found in RCW 34.04.130(6) (e) and (f).[1] It was stated in *Norway Hill Association* at page 276:

, We hold, therefore, that both the "clearly erroneous" and "arbitrary or capricious" standards of review set forth in RCW 34.04.130(6) (e) and (f) are appropriate for judicial review of determinations of no significant impact made pursuant to SEPA.

(Footnote omitted.) The procedural provisions of SEPA constitute an environmental full-disclosure law. The review standards of "clearly erroneous" and "arbitrary or capricious" best promote that policy of disclosure by not insulating agency determinations from court review by too strict a standard of review. *Norway Hill Preservation & Protection Ass'n v. King County Council, supra.*

In the instant case, we need not decide if the planning director's finding of "no significant impact" is arbitrary or capricious. In the instant case, the written material assembled in connection with the determination of the director, is comprehensive. For example, there is substantial data concerning environmental, demographic, and economic aspects of the project contained in a report from the Seattle Marine Laboratories entitled "Environmental Data on Crockett Lake and Keystone Shores." Further the director interviewed experts and gave careful consideration to various viewpoints.

We have often discussed the question of what is "arbitrary and capricious." *Norway Hill Preservation & Protection Ass'n v. King County Council, supra,* citing with approval *Ancheta v. Daly,* 77 Wn.2d 255, 461 P.2d 531 (1969); *Department of Ecology v. Kirkland,* 8 Wn. App. 576, 508 P.2d 1030 (1973), *aff'd on other grounds,* 84 Wn.2d 25, 523 P.2d 1181 (1974). Because this is decided on the basis of the

---

[1] "(6) . . .

 " . . .

"(e) clearly erroneous in view of the entire record as submitted and the public policy contained in the act of the legislature authorizing the decision or order; or

"(f) arbitrary or capricious."

"clearly erroneous" test, we find it unnecessary to further discuss the "arbitrary and capricious" test.

 Without deciding if the director's action could be deemed "arbitrary or capricious," there is adequate basis for review if the finding of "no significant impact" can be held to be "clearly erroneous." The manner in which this latter standard of review differs from the former "arbitrary and capricious" standard is discussed in *Norway Hill Association* at page 274:

> The "clearly erroneous" standard provides a broader review than the "arbitrary or capricious" standard because it mandates a review of the entire record and all the evidence rather than just a search for substantial evidence to support the administrative finding or decision. *See Ancheta v. Daly, supra* at 259-60; *Department of Ecology v. Kirkland,* 8 Wn. App. 576, 580, 508 P.2d 1030 (1973), *aff'd on other grounds,* 84 Wn.2d 25, 523 P.2d 1181 (1974); *Williams v. Young,* 6 Wn. App. 494, 497, 494 P.2d 508 (1972). Judicial review under the "clearly erroneous" standard set out in RCW 34.04.130(6)(e) also requires consideration of the "public policy contained in the act of the legislature authorizing the decision." *See Ancheta v. Daly, supra* at 260-61. Consequently, that public policy is "a part of the standard of review." *See Schuffenhauer v. Department of Employment Security,* 86 Wn.2d 233, 235, 543 P.2d 343 (1975).
>
> . . .
>
> . . . . the public policy contained in SEPA is consideration of environmental values. To this end SEPA requires in appropriate cases a detailed environmental impact statement before decisions are made. The "clearly erroneous" standard of review permits sufficient judicial scrutiny of "negative threshold determinations" to prevent frustration of this policy. A determination of no significant environmental impact "can be held to be 'clearly erroneous' if, despite supporting evidence, the reviewing court on the record can firmly conclude 'a mistake has been committed.' " *Stempel v. Department of Water Resources* [82 Wn.2d 109, 508 P.2d 166 (1973)] at 114, quoting *Ancheta v. Daly, supra* at 260.

(Footnotes omitted.)

 The correctness of the planning commission's find-

ing necessarily must be measured against the meaning attached to the words "significantly affecting" contained in RCW 43.21C.030(c). We have indicated that the word "significantly" means any action taken toward an environment which has the reasonable probability of having more than a moderate effect on the quality of that environment. In *Norway Hill Association* the court enunciated the rule at page 278:

> Consistent with this policy it would seem appropriate to state a general guideline rather than attempt a value-laden definition of "significantly." Generally, the procedural requirements of SEPA, which are merely designed to provide full environmental information, should be invoked whenever more than a moderate effect on the quality of the environment is a reasonable probability.

The Department of Game advised the board of commissioners that Crockett Lake supports some 1,200 to 1,500 ducks annually and that the lake serves as a temporary way station for various other species of birds engaged in continental migration. Rare and endangered species in the area are dependent on the lake for sanctuary. Specifically mentioned were bald eagles, marsh hawks, whistling swans, snowy owls, mergansers, great blue herons, and relatively uncommon shovellers. River otter also use the lake. Increased human population near the lake was indicated as having a major impact on the character of the lake as a habitat. Respondents were cautioned by the Department of Game by letter of January 21, 1974, that:

> The development of this subdivision in itself will not have any major influence on Crockett Lake, but the ensuing disturbance factors that will result when the development has been completed would undoubtedly have a major impact. Dogs running loose in the area, kids playing, and general human activity would eliminate a large portion of the value of the lake for wildlife.

The value of Crockett Lake was called to the attention of the planning director in a letter of February 11, 1974, from the United States Department of the Interior, in this manner:

> Lake Crockett is highly valuable to waterfowl in Whidbey

Island and the principal threat to wildlife habitat on the Island is residential and related development. Our Bureau has a high priority nationwide policy of protecting important wetlands. The Bureau has a limited capability to purchase all the valuable habitat and therefore must rely to a great extent on the wise planning and resource management policies of State and local agencies to assist in this aim.

Concerns were voiced by the State Parks and Recreation Commission that the proposed project would detract from the aesthetic quality and visual historic interpretation of the Fort Casey site adjacent to respondents' proposed development. Respondents' subdivision is immediately adjacent to a scenic and recreational highway as designated by the legislature in Laws of 1967, 1st Ex. Sess., ch. 85, p. 1772. This highway serves the historical site, the ferry dock, and a public boat launching facility. Conflict was seen in the competing uses and users of the area around the Fort Casey Historical Park, the boat launching ramp, the Keystone Ferry Landing and the shoreline lot owners of respondents' development. The State Parks and Recreation Commission stated their concerns by letter of April 26, 1974, with these comments:

1. . . . Some park visitors may ignore State Park boundary signs and trespass tide flats of the adjacent private property, and this can create a significant management problem.

2. Conversely, we see the potential for trespass by the private property owners upon State Parks property after closing hours. This will add to an additional enforcement problem for the manager at Fort Casey.

. . .

4. It would appear this proposal will cause a significant increase in the road system use adjacent to the park and result in increased traffic loads. This will tend to detract from the aesthetic quality of the experience for park patrons at Fort Casey.

5. This further increase . . . will result in a significant increase in congestion during periods of ferry loading and unloading at the Fort Casey site. The existing traffic congestion at the entrance road to the park will be further compounded by this increase in volume.

6. This substantial subdivision will result in a significant aesthetic intrusion upon the entire Fort Casey area by decreasing expanse of the visual basin.

7. Visual historic interpretation will be lost due to site limitations to be imposed by this subdivision.

It should be added that the Department of Ecology, as a party to the suit, plus the Central Whidbey Island Historic Preservation Advisory Committee, took the position that an impact statement was necessary.

Applying the "clearly erroneous" standard of review to the instant case, we are left with the definite and firm conviction that a mistake has been committed with regard to the planning director's finding of "no significant impact." Respondents' activities will have more than a moderate effect on the quality of the environment. Recommendations made by the United States Department of the Interior, Fish and Wildlife Service; the State Department of Game; Department of Ecology; and the State Parks and Recreation Commission, leave this court with the belief that the following findings by the director are "clearly erroneous:"

iv. The wildlife of the area will not be destroyed or significantly affected by the human activities associated with the development. There appears to be no wildlife resident or breeding in the area that is considered rare and/or endangered.

v. Public access to the shorelines of Admiralty Bay will not be significantly reduced.

vi. Public use of the area for bird watching, photography, sightseeing, surf fishing, skin diving, beach combing, and strolling will not be significantly reduced.

. . .

x. Additional population in this location will not of itself increase the demand for commercial facilities in the immediate vicinity.

. . .

xii. The short-term local uses of the environment—i.e. recreational housing—will not significantly adversely effect the long term productivity of the area in terms of wildlife habitat, public use, etc.

xiii. The utilization of the spit for this development

does not constitute an irreversible and irretrievable commitment of resources.

■ After carefully considering the arguments and authority in support thereof, we conclude that the deliberations and vote cast by the board of county commissioners, are void for lacking an "appearance of fairness." This doctrine has been developed to preserve the highest public confidence in those governmental processes which bring about zoning changes or which formulate property use and land planning measures. *Smith v. Skagit County,* 75 Wn.2d 715, 453 P.2d 832 (1969); *Chrobuck v. Snohomish County,* 78 Wn.2d 858, 480 P.2d 489 (1971); *Fleming v. Tacoma,* 81 Wn.2d 292, 502 P.2d 327 (1972); *Anderson v. Island County,* 81 Wn.2d 312, 501 P.2d 594 (1972); *Narrowsview Preservation Ass'n v. Tacoma,* 84 Wn.2d 416, 526 P.2d 897 (1974). It is the possible range of mental impressions made upon the public's mind, rather than the intent of the acting governmental employee, that matters. The question to be asked is this: Would a disinterested person, having been apprised of the totality of a board member's personal interest in a matter being acted upon, be reasonably justified in thinking that partiality may exist? If answered in the affirmative, such deliberations, and any course of conduct reached thereon, should be voided.

In the instant case, Commissioner Vanderzicht, seconded and voted upon the motion to overrule the planning commission and to approve the preliminary plat of Keystone Shores on April 10, 1972. At the time of voting, he was a stockholder and chairman of the board of Island Savings and Loan Association. The savings and loan association was listed on the Keystone Estate Plat as a dedicator. We are aware that the Association's only interest was in the Keystone Estates Division and that Commissioner Vanderzicht voted only on the preliminary plat approval of Keystone Shores Division No. 1.

We are further aware that Commissioner Vanderzicht had ceased to be a member of the commission when the final vote on the project was taken. Nevertheless, opportu-

nity exists for public suspicion. The Association will stand to benefit if it can be said that the entire project is made more solvent, or the entire inventory of plats is made more marketable by the platting of the shoreline portion of the Seabreeze project. Seabreeze Estates, by the very name, suggests a saltwater-oriented development. The inclusion of actual seaward lots in the total project, whether or not the Association owns any mortgagee interest in those lots, does contribute to the prestige of the entire project. The inland lots upon which the Association owns a mortgagee's interest are made more marketable by the seaward lots being included in the entire project. This enhancement is sufficient to bring the doctrine of "appearance of fairness" into play. It must be stressed that there is no evidence that either the Association, or Mr. Vanderzicht had any improper intent. It is the appearance, however, that is determinative.

The issue of "piecemealing" a single project affecting uplands and shorelands, so as to allow one portion of the project to proceed while the other portion of the project awaits approval, is not present here. The case of *Merkel v. Port of Brownsville*, 8 Wn. App. 844, 509 P.2d 390 (1973) is not applicable. Under our holding in the instant appeal, the entire subdivision of Seabreeze Estates is subject to the requirement that an environmental impact statement be filed. No portion of the project can proceed until compliance of the entire project has been effected. There is no opportunity for the piecemealing abuses found in *Merkel* to exist here.

■ Appellants have urged this court to award attorneys' fees on the theory that this court should adopt the "private attorney general" doctrine. The general rule on attorneys' fees in Washington is stated in *State ex rel. Macri v. Bremerton*, 8 Wn.2d 93, 113-14, 111 P.2d 612 (1941):

> In absence of contract, statute, or recognized ground of equity, a court has no power to award an attorney's fee as part of the costs of litigation.

A ground in equity, recognized by this court, for an award

of attorneys' fees is the "common fund" doctrine which allows for an award of attorneys' fees out of a fund created or preserved by a litigant for the benefit of a class of persons. *Weiss v. Bruno*, 83 Wn.2d 911, 523 P.2d 915 (1974). The "common fund" doctrine has no application to the case now before the court. Nor does this case fall within any ground recognized by our decisions as a basis for allowance of attorneys' fees.

There being no rule of law authorizing an award of attorneys' fees in a case such as this, we deny appellants' request for attorneys' fees except as provided by statute. RCW 4.84.010, 4.84.080, and 4.88.260.

We, therefore, reverse the trial court except that the disallowance of attorneys' fees is affirmed.

STAFFORD, C.J., and ROSELLINI, HUNTER, HAMILTON, UTTER, BRACHTENBACH, and HOROWITZ, JJ., concur.