[Nos. 3696–II; 5047–II.   Division Two.   May 13, 1981.]

THE CITY OF HOQUIAM, *Appellant,* v. PUBLIC
EMPLOYMENT RELATIONS COMMISSION,
ET AL, *Respondents.*

*Omar S. Parker, City Attorney,* and *Jon C. Parker, Assistant,* for appellant.

*Kenneth O. Eikenberry, Attorney General, Richard A. Heath, Assistant,* and *William Wesselhoeft* and *James B. Street,* for respondents.

PEARSON, J.—In these consolidated appeals, the City of Hoquiam seeks review of the Superior Court's quashing of a writ to prohibit an examiner with the Public Employment Relations Commission (PERC) from conducting a hearing into a claim of an unfair labor practice brought by the Hoquiam firefighters union (Union). The Union, joined by PERC, appeals in turn from a later Superior Court judgment on appeal from the hearing examiner's decision on the merits, in which the court found it had jurisdiction and reversed the examiner. We vacate both judgments and remand the cause for a new administrative hearing.

The matter had its genesis in the retirement of one of the four captains in the City of Hoquiam's fire department. Hoquiam had three captains serving as shift officers at its Main Station and one captain and two lieutenants serving as shift officers at its Eastside Station. When one of the Main Station captains retired in March 1977, the Eastside captain was assigned to replace him. The Eastside captain's job, in turn, was filled temporarily by lieutenants working "out of classification," for which they were paid at the higher salary rate for captains pursuant to the collective bargaining agreement between the Union and the City. After about 4 months, however, a specific person was appointed lieutenant and assigned to serve in that position of shift officer. Thereafter, the shift officers at the Eastside

Station were all lieutenants, and paid as such.

In February 1978, the battalion chief took disability leave. One of the three shift captains at the Main Station was promoted to acting battalion chief, and a Lieutenant Helland was notified of his promotion to shift captain at the Main Station. He performed the same duties as the other shift captains at the Main Station until August 1978, but was not actually promoted to captain or given captain's pay. In July 1978, the department conducted competitive examinations, as a result of which a David Ludwig was certified first on both the lieutenant's and captain's promotion lists. On August 15, Ludwig commenced serving as a shift lieutenant at the Main Station, and Helland was transferred to the Eastside Station as a lieutenant.

The net result of these personnel changes was that two of the shift officer positions previously occupied by captains at the two stations were occupied instead by lieutenants, who were paid 5 percent less than captains. The City relied on the "management rights" clause in the collective bargaining agreement in downgrading these positions.[1]

The Union was dissatisfied with the downgrading of positions and filed a grievance in which it alleged that the City had refused to negotiate the issue under a clause in the collective bargaining agreement providing for discussion with the Union representative before any "permanent changes are made in basic policy." The Union also tried to obtain arbitration, but the City denied the grievance and

---

[1]The management rights clause provides in part as follows:

"The Union recognizes *the prerogative of the City to operate and manage its affairs in all respects* in accordance with its responsibilities, and the powers or authority which the City possesses.

". . .

"2. The City has the right to *schedule work* as required in a manner most advantageous *to the City* and consistent with the requirements of municipal employment and public interest.

". . .

"4. . . . The City reserves the right to *lay off* for lack of work or funds . . . where such continuation of work would be *wasteful* and *unproductive*. *The City shall have the right to determine reasonable schedule of work and to establish the methods and processes by which such work is performed.*" (Italics ours.)

refused to submit to arbitration. The Union filed a complaint with the Public Employment Relations Commission (PERC), alleging that the City's refusal to negotiate violated RCW 41.56.140(1), (4), which state that it is an unfair labor practice for a public employer to "interfere with, restrain, or coerce public employees in the exercise of their rights" or to "refuse to engage in collective bargaining."

Prior to a scheduled hearing on the complaint, the City sought a writ to prohibit PERC "from further action" in the Union's complaint on the grounds PERC

> has lost jurisdiction over the aforementioned case and has lost the power to hear said case because the Appearance of Fairness doctrine is being violated. Mary Ellen Krug, Chairman of said Public Employment Relations Commission, and a commissioner, is also a partner in the law firm of Schweppe, Doolittle, Krug, Tausend, Beezer & Beierle, which firm is representing the complainant Firefighters in the proceeding before said Commission.

In his affidavit in support of the writ, the city attorney complained that

> The law firm of Schweppe, Doolittle, Krug, Tausend, Beezer & Beierle is representing a party to a proceeding before a Commission of which a partner in the firm is a member. This creates the appearance that the proceeding is not impartial, disinterested, fair nor are the members of the Commission free from entangling influences. For these reasons the City of Hoquiam cannot receive due process of law in the proceeding and therefore the Commission should be prohibited from taking action until the taint of unfairness is removed.

The Superior Court issued a temporary writ. PERC Chairman Krug then filed an affidavit in which she stated as follows:

> I consider myself automatically disqualified with respect to any cases which come before the Commission to which any client of my law firm is a party or in which it has an interest . . .
>
> If the instant case were ever to reach the Commission, I would certainly disqualify myself. This means that there would be no discussion of the case in my presence.

I would see no documents pertaining to the case and would take no part in the decision of the case. Commissioners Beck and Roberts alone would consider and decide the case.

In the office of my law firm, cases that could come before PERC or its staff are not discussed with me, and I do not know they are pending unless something like the instant case arises. I still know nothing of the Hoquiam Firefighters' case except that the jurisdiction of PERC has been challenged because of my presence on the Commission.

I am acquainted with Rex Lacy [the PERC hearing examiner] as a staff member, but I have never discussed any particular case with him and I have not and will not discuss the instant case with him.

Based on this affidavit, Judge Kirkwood of the Superior Court dissolved the writ of prohibition, having determined that Mary Ellen Krug had disqualified herself from any consideration of the Union's complaint before PERC and that there was no reason for the other two members of the Commission to be disqualified.

The City appealed Judge Kirkwood's decision in cause No. 3696–II and requested that this court stay the PERC proceedings pending appeal. We denied the stay, and the PERC hearing examiner conducted a hearing and ruled in favor of the Union on the unfair labor practice claim.

The City did not then exercise its right of appeal to the Commission as afforded by WAC 391–21–534,[2] reasoning that to do so would be futile given the presence of Chairman Krug on the Commission—a circumstance which, the City continued to argue, violated the appearance of fairness doctrine. The City, therefore, appealed the examiner's

---

[2] WAC 391–21–534 provides, in part, as follows:

"Within twenty days following the date of the issuance of the examiner's findings of fact, conclusions of law and order, any party may file with the commission a petition for review of all or any part of the examiner's findings of fact, conclusions of law and order or to any other part of the record or proceedings, including rulings upon all motions or objections."

decision directly to the Superior Court.[3] Judge Schumacher of the Superior Court refused to find that res judicata or collateral estoppel barred his consideration of the appearance of fairness issue, and ruled that the City was not required to exhaust its administrative remedies by first appealing to the PERC Commissioners because the appearance of fairness was violated by Ms. Krug's presence on the Commission while her law firm was representing a complainant. Turning to the merits, he then found the hearing examiner's determination of an unfair labor practice to be clearly erroneous and reversed that decision. The Union and PERC appeal Judge Schumacher's decision in cause No. 5047–II.

We do not resolve the merits of the unfair labor practice claim, however. The dispositive issue in this appeal relates to the fact that the law firm in which Mary Ellen Krug is a partner continued to represent a party in proceedings before the public agency of which she was also a commissioner. This circumstance has been characterized by the City as a violation of the appearance of fairness doctrine. We are not convinced that the facts fall within that specific doctrine as developed in the case law of this state, but we do hold that a breach of professional ethics has occurred which warrants a new administrative proceeding.

The appearance of fairness doctrine has evolved

---

[3]WAC 391–21–536 provides:

"Upon its own motion, or upon the filing of a petition for review, the commission shall cause the entire record in the proceeding to be transferred to it, and thereafter all motions and arguments shall be directed to the commission. The commission shall, on the basis of the record and any briefs or arguments submitted to it on review, affirm, modify or reverse the decision of the examiner or may remand the case to the examiner with instructions for further hearing. *In the event no timely petition for review is filed as provided in WAC 391–21–534* and no action is taken by the commission upon its own motion to transfer the case to the commission within thirty days following the issuance of the examiner's findings of fact, conclusions of law and order, *the findings of fact, conclusions of law and order of the examiner shall automatically become the findings of fact, conclusions of law and order of the commission and shall have the same force and effect as if issued by the commission.*" (Italics ours.)

to preserve the highest public confidence in governmental processes which bring about zoning changes or regulate land use. *Swift v. Island County,* 87 Wn.2d 348, 361, 552 P.2d 175 (1976); *Narrowsview Preservation Ass'n v. Tacoma,* 84 Wn.2d 416, 420, 526 P.2d 897 (1974) (questioned on other grounds in *Norway Hill Preservation & Protection Ass'n v. King County Council,* 87 Wn.2d 267, 276 n.6 (1976)); *Smith v. Skagit County,* 75 Wn.2d 715, 453 P.2d 832 (1969). As the doctrine has evolved, it has been most often applied to administrative tribunals acting in a quasi–judicial capacity, whether they are adjudicating rights in zoning or other subject matters, as an extension of the due process requirement that judicial officers be free of any taint of bias. *Save A Valuable Environment v. Bothell,* 89 Wn.2d 862, 874, 576 P.2d 401 (1978); *Chicago, M., St. P. & Pac. R.R. v. State Human Rights Comm'n,* 87 Wn.2d 802, 807, 557 P.2d 307 (1976); *Buell v. Bremerton,* 80 Wn.2d 518, 524, 495 P.2d 1358 (1972); *Fleck v. King County,* 16 Wn. App. 668, 670–71, 558 P.2d 254 (1977). *See also Hill v. Department of Labor & Indus.,* 90 Wn.2d 276, 580 P.2d 636 (1978).

*Evergreen School Dist. 114 v. Clark County Comm. on School Dist. Organization,* 27 Wn. App. 826, 831–32, 621 P.2d 770 (1980).

The doctrine has been applied not only to cases where an actual conflict of interest arises, but also to cases where a conflict of interest may appear to have influenced an administrative action. *Buell v. Bremerton,* 80 Wn.2d 518, 523, 495 P.2d 1358 (1972). In *Hayden v. Port Townsend,* 28 Wn. App. 192, 622 P.2d 1291 (1981), we recently considered a situation in which a savings and loan association had an option to purchase land if the parcel could be rezoned to permit construction of a savings and loan building. An officer of the savings bank served as chairman of the planning commission that gave preliminary approval to the application at the planning commission hearing and acted as advocate at the city council meeting in which the application was approved. Later, when the appearance of fairness issue was raised, the city council rescinded its action and remanded the matter for another hearing by the planning commission. At the new hearing, the officer did step down

as chairman, but then assumed the role as advocate for his employer at both the planning commission and the later city council meetings where the rezone was approved. We held the appearance of fairness was violated because, despite the planning commission chairman's obvious interest in the rezone, he took an active, dual role of an insider with special knowledge and involvement in processing the application, and then as advocate before the ultimate decision makers.

This case is different in that Ms. Krug took no active role in any part of the proceeding and stated she would disqualify herself if the case ever came before the Commission itself. She tried scrupulously to avoid any involvement with this case and all others in which her law firm represented a party appearing before PERC. Her policy complied fully with RCW 42.18.160, the Executive Conflict of Interest Act, which requires such disqualification. A policy of compliance with the statute does not end our inquiry, however. The next question remaining is whether the appearance of fairness doctrine derived from our cases has been violated.

The issue is troubling in this case, and we think it poses a close question. Ms. Krug's name appeared on PERC's official acknowledgement of the unfair labor complaint as well as on the letterhead of the law firm filing that complaint. The City's concern was triggered, understandably, by Ms. Krug's presence on the Commission while at the same time the Union, the City's opponent in the proceeding, was being represented by the firm of which she was an active member; apparently she stood to share in the legal fees generated by this case as if it were any other file in the office. We are concerned, as we remarked in *Hayden v. Port Townsend,* 28 Wn. App. at page 197, that a neutral observer might "be compelled to conclude that there exists the appearance of an action taken in part because the [Union] had an unfair advantage in obtaining access to the decision makers." *See also Swift v. Island County,* 87 Wn.2d 348, 361, 552 P.2d 175 (1976). On the other hand, the case never reached the Commission level, where the

"decision makers" could include Ms. Krug; the proceeding was challenged at the examiner level, where no such unequal access was even alleged. In fact, Examiner Lacy specifically stated that not only had Ms. Krug disqualified herself from Commission–level decisions in the past in similar circumstances, but he, the examiner, is a civil service employee whose employment is governed and protected by statute; is not supervised by Chairman Krug; and had never discussed the case with her. We need not decide, however, if the decisional law on the appearance of fairness doctrine compels us to invalidate the proceedings before the hearing examiner. We base our decision instead on the professional ethics pertinent to this situation.

■ The entire subject of attorney service with public agencies and boards, both before and after they have represented clients in front of those same governmental bodies, has been discussed at length in recent court decisions and law review articles.[4] The United States Court of Appeals for the Second Circuit has recently decided *Armstrong v. McAlpin,* 625 F.2d 433 (2d Cir. 1980), which we believe is destined to become a landmark in the field. Judge Feinberg, writing for the court sitting en banc, issued the following holdings: (1) A trial court order denying a motion to disqualify an attorney or firm on ethical grounds is not appealable as a matter of right, overruling *Silver Chrysler Plymouth, Inc. v. Chrysler Motors Corp.,* 496 F.2d 800 (2d Cir. 1974); (2) an order granting such a motion to disqualify is appealable under the narrow exception to the final judgment rule carved out by *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541, 93 L. Ed. 1528, 69 S. Ct. 1221

---

[4]Some of the articles and decisions on this subject include Lacovara, *Restricting the Private Practice of Former Government Lawyers,* 20 Ariz. L. Rev. 369 (1978); Note, *The Chinese Wall Defense to Law–Firm Disqualification,* 128 U. Pa. L. Rev. 677 (1980); Note, *Ethical Problems for the Law Firm of a Former Government Attorney: Firm or Individual Disqualification?,* 1977 Duke L.J. 512; Comment, *Conflicts of Interest and the Former Government Attorney,* 65 Geo. L.J. 1025 (1977); Aronson, *Conflict of Interest,* 52 Wash. L. Rev. 807, 835–48 (1977); *Kesselhaut v. United States,* 555 F.2d 791 (Ct. Cl. 1977).

(1949) (an order is appealable (a) if collateral to the merits, (b) if denial of an immediate appeal would irreparably damage the party seeking review, and (c) if the issue raised is "too important" to "be deferred until the whole case is adjudicated"); (3) although a lawyer who participated in an investigation of and litigation against a party while he was employed by a government agency, and who later joined a law firm representing an opposing party in related proceedings, is disqualified from taking part in the firm's representation, the disqualification does not necessarily extend to the entire law firm; (4) a lawyer's disqualification under Disciplinary Rule 9–101(B) due to past government employment does not extend to his entire law firm under DR 5–105(D) if the firm and lawyer employ screening measures that will effectively isolate the individual lawyer from participating in the matter and sharing in the fees derived from it.

Provisions of the American Bar Association's Code of Professional Responsibility bear on this issue and were the focus of the *Armstrong* opinion. Canon 9 states that "[a] lawyer should avoid even the appearance of professional impropriety"; Disciplinary Rule 9–101(B) provides:

A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee.

DR 5–105(D) provides:

If a lawyer is required to decline employment or to withdraw from employment under a Disciplinary Rule, no partner, or associate, or any other lawyer affiliated with him or his firm, may accept or continue such employment.[5]

*Armstrong* relies heavily on two bar association interpretations of these rules, *ABA Comm. on Professional Ethics, Opinions,* No. 342 (1975) (62 A.B.A.J. 517, 520 (1976)), and

---

[5]Washington's (CPR) DR 5–105(D) is slightly different. It provides that "[i]f a lawyer is required to decline employment or to withdraw from employment under DR 5–105, no partner or associate of his or his firm may accept or continue such employment." See footnote 12 for a further discussion of this variance.

Committee on Professional and Judicial Ethics of the Association of the Bar of the City of New York, Opinion No. 889 (1976). See Appendix. Both ethical opinions rejected an absolute rule of disqualification for a law firm because of disqualification of a *former* government attorney, if adequate screening procedures effectively isolated the latter from the handling of the matter by other lawyers in the firm.

Several competing policies lie behind the disqualification of former government lawyers, on the one hand, and on the other hand the perceived desirability of limiting those instances in which the members of the lawyer's present firm must also be disqualified. ABA Opinion No. 342 identifies the policies behind DR 9–101(B) as follows:

1. To avoid the "treachery" of lawyers switching sides in litigation;

2. To safeguard confidential governmental information from future use against the government;

3. To discourage government lawyers from handling assignments in such a way as to encourage their own future employment in those same matters after leaving government service; and

4. To preserve "the professional benefit derived from avoiding the appearance of evil."[6]

---

[6]The "appearance of evil" is admittedly a vague phrase. ABA Opinion No. 342 defines it in part with reference to EC 9–2 and 9–3:

"EC 9–2 Public confidence in law and lawyers may be eroded by irresponsible or improper conduct of a lawyer. On occasion, ethical conduct of a lawyer may appear to laymen to be unethical. In order to avoid misunderstandings and hence to maintain confidence, a lawyer should fully and promptly inform his client of material developments in the matters being handled for the client. While a lawyer should guard against otherwise proper conduct that has a tendency to diminish public confidence in the legal system or in the legal profession, his duty to clients or to the public should never be subordinate merely because the full discharge of his obligation may be misunderstood or may tend to subject him or the legal profession to criticism. When explicit ethical guidance does not exist, a lawyer should determine his conduct by acting in a manner that promotes public confidence in the integrity and efficiency of the legal system and the legal profession.

"EC 9–3 After a lawyer leaves judicial office or other public employment, he should not accept employment in connection with any matter in which he had

Other policies, which may fit into the general category of "appearance of evil," can be added to those listed above:

5. The appearance that a litigant, by employing the former government lawyer's firm, may be gaining favoritism from the lawyer's former colleagues in the agency or access to privileged or confidential information in the lawyer's possession about the internal practices of the particular agency;[7]

6. To safeguard against the possibility that a law firm would "buy" a key opposition attorney in government for the purpose of hampering the government's enforcement efforts;[8]

7. To protect against the possibility of a government attorney's initiating government action "to obtain discovery of information against a potential defendant in private litigation, or to obtain subsequent private employment to uphold or upset that action."[9]

Mary Ellen Krug's situation as PERC chairman, rather than as a *former* government lawyer who had entered private practice, placed her outside many of these policies; for example, there was no danger of her switching sides, handling an assignment so as to enhance her prospects for future public employment, or being "bought" by the firm of which she was already a member, nor did she initiate the PERC action to obtain information for use in subsequent private litigation. Moreover, we think that Mr. Philip A. Lacovara, a former member of the "Watergate" prosecution force and a member of the District of Columbia Bar's Legal Ethics Committee, has effectively shown many of the poli-

---

substantial responsibility prior to his leaving, since to accept employment would give the appearance of impropriety even if none exists."

[7]*See* New York City Bar's Opinion No. 889; Lacovara, *Restricting the Private Practice of Former Government Lawyers*, 20 Ariz. L. Rev. 369, 385 (1978).

[8]Lacovara, *supra* at 386.

[9]*Id.*

cies identified above to be straw men. Lacovara, *Restricting the Private Practice of Former Government Lawyers,* 20 Ariz. L. Rev. 369, 385–87 (1978).

Nevertheless, DR 9–101(B) is designed to effectuate Canon 9's injunction to avoid even the appearance of professional impropriety by requiring a lawyer to decline private employment "in a matter in which he had substantial responsibility while he was a public employee." The policy most obviously behind this rule, as applied to Ms. Krug, is that of "the appearance of evil"—specifically, the appearance that the Union, as a client of her law firm, was in a position to receive favorable treatment at the hands of the PERC examiner and staff because of those employees' awareness that the PERC chairman was a member of the firm appearing before them. The issue was all the more acute when Ms. Krug was not *formerly,* but *presently,* in a position of potential responsibility over the matter in which her firm was then employed.[10]

This case stopped below the level at which Ms. Krug operated as chairman of the Commission that reviews the decisions of PERC hearing examiners. Ms. Krug, therefore, never had any "substantial responsibility" in the case as a government employee. *See* ABA Opinion No. 342. She recognized an appearance of impropriety problem, however, and disqualified herself from consideration of the case, as required by RCW 42.18.160. Nor could she have resigned

---

[10]Ms. Krug's position as PERC Commissioner may be likened to that of a judge who hears appeals from the examiner's decisions, *Hill v. Department of Labor & Indus.,* 90 Wn.2d 276, 580 P.2d 636 (1978). We note, by way of comparison, that CJC 3(C)(1) provides for disqualification of a judge where

(a) *he has a personal bias or prejudice concerning a party,* or personal knowledge of disputed evidentiary facts concerning the proceeding;

(b) he served as lawyer in the matter in controversy, or *a lawyer with whom he previously practiced law served during such association as a lawyer concerning the matter,* or the judge or such lawyer has been a material witness concerning it . . .

(Italics ours.)

from PERC[11] and then handled the matter on behalf of the Union personally, under DR 9–101(B). We think it clear, in addition, that her entire law firm was disqualified from representing the Union, because DR 5–105(D) imputes a lawyer's personal disqualification to his or her entire firm.[12] This policy should apply with equal force whether the disqualification is due to statute or ethical rule.

We have mentioned that *Armstrong v. McAlpin* draws upon ABA Opinion No. 342 and the New York City Bar's Opinion No. 889 to carve out an exception to vicarious disqualification of the entire firm, as long as screening procedures are used to effectively isolate the former government attorney from the matter in which he was previously involved. This exception has been devised mainly because a blanket disqualification rule would have a significantly adverse impact on the ability of government agencies to attract qualified personnel; because the law disfavors unnecessary or unjustified restraints on individual employment; and because the Bar has an obligation to ensure that skilled legal counsel, who may have developed a specialty during public employment, are available to the public at large. New York City Bar Opinion No. 889. In addition, a blanket disqualification would serve no worthwhile public

---

[11]In fact, Mary Ellen Krug did resign from the Commission following Judge Schumacher's ruling that her dual role as chairman of PERC and member of the law firm violated the appearance of fairness doctrine.

[12]The American Bar Association's DR 5–105(D) now requires firm disqualification when a lawyer "is required to decline employment or to withdraw from employment under a Disciplinary Rule." Prior to 1974, the rule read, as Washington's (CPR) DR 5–104(D) still reads, "required to decline employment or to withdraw from employment under DR 5–105". DR 5–105 speaks only to some, but not all, of the situations in which a lawyer may be disqualified. The fact that Washington's (CPR) DR 5–105(D) has not been amended, for some reason, to reflect the ABA amendment in 1974, does not preclude us from interpreting our present (CPR) DR 5–105(D) in the same way as the federal courts have interpreted the ABA's more modern version. The policy considerations for disqualifying a law firm due to one of its member's need to disqualify himself are present to the same degree in Washington as in other jurisdictions that use the Code of Professional Responsibility.

interest if it were used merely as a tool by one litigant to deprive his opponent of competent counsel. ABA Opinion No. 342.

Basically, two kinds of lawyers enter government service: young lawyers beginning their legal careers with government employment and hoping to acquire experience, and more mature lawyers, like Ms. Krug, who have spent some years in private practice and are then asked to enter supervisory positions in government, with the understanding that they may eventually return to practice. Note, *Ethical Problems for the Law Firm of a Former Government Attorney: Firm or Individual Disqualification?*, 1977 Duke L.J. 512, 522–23. Under a system of blanket firm disqualification, an attorney could become an outcast, unable either to enter private practice as a still–young lawyer or to return to his former firm after a tour of duty with an agency before which the firm had an active practice. *Kesselhaut v. United States,* 555 F.2d 791, 793 (Ct. Cl. 1977). The firm considering hiring a government lawyer under a blanket firm disqualification rule could be confronted with an unpleasant dilemma: either decline to hire a lawyer who has developed a desirable specialty during government service, or drop a client because the lawyer worked on a matter involving that client. Lacovara, 20 Ariz. L. Rev. at 387–88.

We think that interchange between the public and private bars is generally beneficial, both to the lawyers involved and to the public, if done according to responsible ethical considerations. Care must be taken not to make government service so burdensome that few good lawyers would want to serve.

We agree that a screening mechanism, as explained in *Armstrong* and *Kesselhaut,* is a preferred alternative to blanket law firm disqualification. In practical effect, this would mean that a firm, immediately upon perceiving one of its member's former government employment as potential grounds for his personal disqualification from a case or category of cases, should establish and document a policy of (1) excluding that lawyer from participation in all cases

affected; (2) denying him access to all relevant files and related documents; (3) excluding him from all fees earned by the firm in those cases; (4) refraining from discussing the cases in his presence; and (5) precluding him from conveying any information about the opposing parties in such cases or confidential information about relevant agency procedures not available to the public. *See Armstrong v. McAlpin,* 625 F.2d at 442; *Kesselhaut v. United States,* 555 F.2d at 793; ABA Opinion No. 342. Documentation of such a screening policy should enable the law firm to defend successfully against a motion to disqualify, provided no other grounds exist for firm disqualification and the judge or administrative tribunal is satisfied the policy was implemented early enough, and carried out faithfully enough, to avoid contamination of the firm by the individual lawyer. Similarly, if litigation is between the agency where the lawyer was formerly employed and a client represented by his current firm, the agency should be given the first opportunity to examine the screening policy and to waive its reliance upon blanket disqualification if satisfied that effective isolation of the lawyer has been achieved. *See* ABA Opinion No. 342. Then, if the agency does not agree to a waiver and asserts a right to disqualify the firm, the court or other tribunal can decide the matter.

In this case, no such formal screening mechanism was in place. Ms. Krug had diligently taken steps to isolate herself from the law firm's handling of this case, but not to the extent described above, including the disavowal of fees generated by the case. Therefore, we hold that her law firm is disqualified from representing the Union in this complaint. While so holding, we hasten to add, as did Chief Judge Kaufman in *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 226–27 (2d Cir. 1977), that Ms. Krug is a lawyer and public servant who enjoys the highest regard of the profession. The compliance or noncompliance with Canons of Ethics frequently does not "involve morality or venality, but differences of opinions among honest men [and women] over the ethical propriety of conduct."

We turn at last to the merits of the unfair labor practice complaint. The complaint alleged a refusal to bargain over the downgrading of the job once performed by fire captains, and the City's further refusal to arbitrate. The respondent City argued, besides the appearance of fairness issue, (1) that PERC had no authority to enforce the collective bargaining agreement and should defer to the grievance and arbitration procedures established in the agreement; (2) that the Union waived its right to file the complaint because it had failed to raise the issues in various meetings and in bargaining sessions in which two new agreements were negotiated since the captains' reduction problem arose; (3) that, in any event, the City had a right under the "management rights" clause in the contract to eliminate the captains' duties without negotiating with the Union.

The hearing examiner ruled that PERC did have jurisdiction over the complaint because violations of a statute, RCW 41.56.140, were alleged in addition to mere interpretation of the bargaining agreement. He also ruled that the Union had not waived its bargaining rights, either because of the existence of the "management rights" clause in the contract, or by not having raised the issue in subsequent meetings and negotiations. Finally, the examiner ruled that the City had violated RCW 41.56.140(1) and (4) by refusing to bargain over "the impact of the changes of wages and working conditions resulting from the employer's unilateral reclassification."

On appeal, Judge Schumacher, besides finding a violation of the appearance of fairness doctrine, held that the examiner's decision that RCW 41.56.140(1) and (4) had been violated, was "clearly erroneous"; this is because, according to Judge Schumacher's conclusion of law No. 4,

RCW 41.56.030(4)[13] does not contemplate collective

---

[13]RCW 41.56.030(4) provides:

"'Collective bargaining' means the performance of the mutual obligations of the public employer and the exclusive bargaining representative to meet at reasonable times, to confer and negotiate in good faith, and to execute a written agreement with respect to grievance procedures and collective negotiations on

bargaining by the parties when disputes arise which are covered by an existing collective bargaining agreement and the parties have at all times engaged in productive collective bargaining as defined by law.

Judge Schumacher also held that the dispute involves matters within the parties' collective bargaining agreement, whose grievance and arbitration procedures should be applied to resolve the dispute rather than the invocation of PERC jurisdiction; and, further, that the "management rights" clause in the bargained agreement between the parties was controlling.

■ We review the examiner's legal conclusions and mixed conclusions of law and fact de novo, without reference to the Superior Court's decision. *Daily Herald Co. v. Department of Employment Security,* 91 Wn.2d 559, 588 P.2d 1157 (1979); *Franklin County Sheriff's Office v. Sellers,* 27 Wn. App. 797, 621 P.2d 751 (1980). The examiner's conclusions (a) that PERC had jurisdiction over the matter because of the City's refusal to bargain or arbitrate, and (b) that RCW 41.56.140(1) and (4) were violated by such a refusal, depend entirely on his factual determination that the City did, in fact, refuse to bargain or arbitrate. Ordinarily the examiner's decision would be "clearly erroneous" when, although there is evidence to support it, the reviewing court, without substituting its judgment for or disregarding the expertise of the administrative body, is left with the definite and firm conviction that a mistake has been committed. *Ancheta v. Daly,* 77 Wn.2d 255, 461 P.2d 531 (1969).

■ The City's testimony before the examiner was that the City did not refuse to bargain, and did not submit to arbitration simply because it believed that no arbitrable grievance existed at that time. The examiner resolved these basic factual questions against the City and premised his

personnel matters, including wages, hours and working conditions, which may be peculiar to an appropriate bargaining unit of such public employer, except that by such obligation neither party shall be compelled to agree to a proposal or be required to make a concession unless otherwise provided in this chapter."

conclusions on them. We have discussed at length the reasons the Union's law firm should have been disqualified from representation. The remedy for the failure to disqualify should be a remand for a new hearing unless we can say, as a matter of law, that the error was harmless. In this case, given the need for the examiner to resolve critical factual issues in the tainted proceeding, we cannot find harmless error. The "clearly erroneous" test cannot be applied adequately where the fact–finding process has been tainted. The City is entitled to appear before another examiner, opposed by new counsel, and participate in a fact–finding hearing untainted by any appearance of impropriety.

The judgments of the Superior Court and the PERC decision are vacated and remanded for further proceedings consistent with this opinion.

PETRIE, A.C.J., and PETRICH, J., concur.

### APPENDIX

Opinion No. 889 of the Committee on Professional and Judicial Ethics of the Association of the Bar of the City of New York can be located at 31 *The Record of the Association of the Bar of the City of New York* 552, 566 (1976), and 45 U.S.L.W. 2292 (December 14, 1976). Because many readers, particularly outside New York City, will not have ready access to these sources, we reproduce the Law Week excerpt below.

### Attorneys

**Disqualification—**
**Disqualification of former Government attorney from involvement in matter because of "substantial responsibility" in that matter while Government employee does not, as long as attorney can be effectively isolated from matter and where such isolation is sufficient to avoid appearance of impropriety, disqualify attorney's partners and associates from handling matter.**

Disciplinary Rule 9–101(B) states: "A lawyer shall not accept private employment in a matter in which he had substantial responsibility while he was a public employee." The question here is whether this disqualification should be extended to associates of an attorney who is disqualified under DR 9–101(B).

[Text] We believe that the simplicity of a rule requiring automatic disqualification of partners and associates of a disqualified lawyer must be weighed against certain important policy considerations. One of these

is the traditional concern of the law with unnecessary or unjustified restraints on individual employment. Second, a rule of blanket disqualification of partners and associates may well have a potentially adverse impact on the ability of Government agencies to attract qualified personnel to their ranks. Third, there is the obligation of the Bar to ensure that skilled legal counsel, equipped with expertise in necessary areas, is available to the public at large. * * *

In summary, we are in accord with the position taken in ABA Opinion 342, namely, that where a lawyer who is himself disqualified under DR 9–101(B) can be effectively isolated from the handling of a matter by his partners and associates, and where this isolation is sufficient to avoid appearance of improimpriety, then the disqualification should not extend to the lawyer's partners and associates.

However, we would note that ABA Opinion 342 concludes that this standard can apply only "whenever the Government agency is satisfied that the screening measures will effectively isolate the individual lawyer from participating in the particular matter. . . ." (ABA Opinion 342 at 521). Our committee would not go quite so far. We believe that the Government agency should be given an opportunity to analyze the screening methods and to make any objection it deems appropriate. However, we conclude that, in a litigated matter or similar proceeding, to vest in the governmental agency absolute discretion to compel disqualification by refusing to give a requisite waiver or consent in many cases would effectively compel the refusal of such consent out of an understandable fear on the part of Government counsel that should the case be lost, he would be subject to criticism and even possible discipline for failure to take advantage of that veto power. [**End Text**]

Instead, the committee favors the filing of an affidavit with the court or agency involved setting forth the methods by which the disqualified lawyer is to be isolated from the matter. The court or agency could then pass in the first instance on whether disqualification is appropriate.

Of course, this procedure cannot be applied where no tribunal is involved. In such a case, if there is a possibility that DR 9–101(B) might be interpreted to disqualify the entire firm, the attorney may, in his or her discretion, seek the views of the agency as to whether the taint of disqualification should spread beyond the disqualified attorney, after considering the circumstances and the screening techniques set forth in the statement by the attorney. However, the views of the agency should not be taken as dispositive, and administrative or legal remedies should be preserved.

The most serious reasons for disqualifying an entire firm under DR 9–101(B) are: (1) the appearance that a litigant, by employing the ex–Government lawyer's firm is gaining access to undisclosed information in the Government lawyer's possession about the internal practices of the agency involved, and (2) the appearance of favoritism to a law firm of

which a former associate in Government is a member, even though he or she is isolated from the matter. The first objection is based upon the premise that, where a former Government attorney is disqualified, there will always be an appearance of impropriety if the attorney's new firm takes the case. To go this far does a serious disservice to the public and to Government agencies anxious to attract qualified personnel. There may be situations where an entire firm may be disqualified, but to draw an absolute rule does more harm than good. The second objection is the appearance of favoritism to former colleagues. Where this occurs, it is said to be essential to disqualify the firm as well as the individual attorney. This committee is not persuaded by this reasoning. If the appearance of impropriety arises solely from the fact that the firm members are former colleagues of lawyers in an agency then it becomes irrelevant whether a member of the firm is disqualified under DR 9–101(B).

Instead of a blanket rule disqualifying a firm whenever an attorney in that firm is disqualified under DR 9–101(B), this committee concludes that the need to disqualify the entire firm may be eliminated if the attorney involved is effectively isolated from the matter. This would require a factual analysis involving an examination of the circumstances of each case if disservice is not to be done to the Government, the legal profession, and the public through an overbroad and simplistic application of the disciplinary rule. The problem of firm disqualification may not be curable by proper.screening in every case. There will be cases in which the disqualified attorney's relationship with the subject matter was so close, and the significance of his role was so great, that no degree of screening will suffice to remove the appearance of impropriety.

—NY City Bar Association's Committee on Professional and Judicial Ethics; Opinion No. 889, 12/5/76.

Reconsideration denied June 24, 1981.

Review granted by Supreme Court September 25, 1981.